675 F.2d 367
 218 U.S.App.D.C. 348, 214 U.S.P.Q. 161,
1982 Copr.L.Dec. P 25,382, 8 Media L. Rep. 1432
 NATIONAL ASSOCIATION OF BROADCASTERS, Petitioner,
v.
COPYRIGHT ROYALTY TRIBUNAL, Respondent,
Major League Baseball, et al., Motion Picture Association of
America, Inc., Christian Broadcasting Network, Inc.,
Broadcast Music, Inc., Superstation,Inc., National Public
Radio, Public Broadcasting Service, National
CollegiateAthleticAssociation, Intervenors.
NATIONAL PUBLIC RADIO, Petitioner,
v.
COPYRIGHT ROYALTY TRIBUNAL, Respondent,
Major League Baseball, et al., Motion Picture Association of
America, Inc., Christian Broadcasting Network, Inc.,
Broadcast Music, Inc., NationalAssociation of Broadcasters,
Superstation, Inc., Public Broadcasting Service,National
CollegiateAthletic Association, Intervenors.
MAJOR LEAGUE BASEBALL, National Basketball Association,
National Hockey League,and North American Soccer
League, Petitioners,
v.
COPYRIGHT ROYALTY TRIBUNAL and the United States of America,
Respondents,
Motion Picture Association of America, Inc., Christian
Broadcasting Network, Inc., Broadcast Music, Inc., National
Association of Broadcasters,Superstation, Inc., National
Public Radio, Public Broadcasting Service,National
Collegiate AthleticAssociation, Intervenors.
CANADIAN BROADCASTING CORPORATION, Petitioner,
v.
COPYRIGHT ROYALTY TRIBUNAL, Respondent,
Christian Broadcasting Network, Inc., Major League Baseball,
et al., BroadcastMusic, Inc., National Association of
Broadcasters, Superstation, Inc., NationalPublic Radio,
Public Broadcasting Service, National Collegiate
AthleticAssociation,Intervenors.
AMERICAN SOCIETY OF COMPOSERS, AUTHORS AND PUBLISHERS, Petitioner,
v.
COPYRIGHT ROYALTY TRIBUNAL, Respondent,
Christian Broadcasting Network, Inc., Major League Baseball,
NationalAssociation of Broadcasters, Broadcast Music, Inc.,
Superstation, Inc., National Public Radio, Public
Broadcasting Service, et al., National CollegiateAthletic
Association,Intervenors.
 Nos. 80-2273, 80-2281, 80-2284, 80-2290 and 80-2298.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 30, 1981.
Decided April 9, 1982.
 
 Petitions for Review of Orders of the Copyright Royalty tribunal.
 Carleton G. Eldridge, Jr., New York City, with whom Erwin G. Krasnow and James J. Popham, Washington, D. C., were on the brief, for National Association of Broadcasters, petitioner in No. 80-2273 and intervenor in Nos. 80-2281, 80-2284, 80-2290 and 80-2298. Sherman E. Katz, Washington, D. C., also entered an appearance for National Association of Broadcasters.
 David H. Lloyd, Washington, D. C., with whom James F. Fitzpatrick, Robert Alan Garrett, Vicki J. Divoll and Philip R. Hochberg, Washington, D. C., were on the brief, for Major League Baseball, et al., petitioners in No. 80-2284 and intervenors in Nos. 80-2273, 80-2281, 80-2290 and 80-2298.
 Jamie S. Gorelick, Washington, D. C., with whom Nathan Lewin, David O. Stewart, Ernest T. Sanchez, Marc F. G. Giattini and Janice F. Hill, Washington, D. C., were on the brief, for National Public Radio, petitioner in No. 80-2281 and intervenor in Nos. 80-2273, 80-2284, 80-2290 and 80-2298.
 Susan C. Lushing, New York City, with whom Malcolm A. Hoffman, New York City, was on the brief, for Canadian Broadcasting Corporation, petitioner in No. 80-2290.
 Fred I. Koenigsberg, New York City, with whom Bernard Korman and Benjamin L. Zelenko, New York City, were on the brief, for American Society of Composers, Authors and Publishers, petitioner in No. 80-2298.
 John F. Cordes, Atty., Dept. of Justice, Washington, D. C., with whom Thomas S. Martin, Acting Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the brief was filed, and William Kanter, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondent.
 
 
 1
 Arthur Scheiner, Washington, D. C., with whom Dennis Lane, Washington, D. C., was on the brief, for Motion Picture Association of America, Inc., intervenor in Nos. 80-2273, 80-2281 and 80-2284.
 
 
 2
 Charles T. Duncan, Washington, D. C., with whom Joel S. Winnik and Michael W. Faber, Washington, D. C., were on the brief, for Broadcast Music, Inc., intervenor in Nos. 80-2273, 80-2281, 80-2284, 80-2290 and 80-2298.
 
 
 3
 Judith Jurin Semo, Washington, D. C., was on the brief for National Collegiate Athletic Association, intervenor in Nos. 80-2273, 80-2281, 80-2284, 80-2290 and 80-2298.
 
 
 4
 Grover C. Cooper and Clifford M. Harrington, Washington, D. C., entered appearances for Christian Broadcasting Network, Inc., intervenor in Nos. 80-2273, 80-2281, 80-2284, 80-2290 and 80-2298.
 
 
 5
 Robert F. Corazzini and Peter H. Feinberg, Washington, D. C., entered appearances for Superstation, Inc., intervenor in Nos. 80-2273, 80-2281, 80-2284, 80-2290 and 80-2298.
 
 
 6
 Gene A. Bechtel, Theodore D. Frank, Eric H. Smith and Jacqueline Weiss, Washington, D. C., entered appearances for Public Broadcasting Service, intervenor in Nos. 80-2273, 80-2281, 80-2284, 80-2290 and 80-2298.
 
 
 7
 Before J. EDWARD LUMBARD,* Senior Circuit Judge, MacKINNON and MIKVA, Circuit Judges.
 
 
 8
 Opinion for the Court filed by Circuit Judge MIKVA.
 
 MIKVA, Circuit Judge:
 
 9
 These consolidated cases present various challenges to the first distribution of cable royalty fees under the 1976 Copyright Act, 17 U.S.C. § 101 et seq. (Supp. III 1979) (the Act). Respondent is a governmental agency, the Copyright Royalty Tribunal (Tribunal), whose function is to make an annual distribution of royalty fees paid by cable television operators for their retransmission of certain copyrighted programming. The Act invests the Tribunal with broad discretion in apportioning these royalty fees. Specific awards are reversible only if the agency's decision is not supported by "substantial evidence" or is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" as defined by the Administrative Procedure Act, 5 U.S.C. § 706 (1976). Judged by these standards, the Tribunal's decision adequately supports and explains almost all of its royalty allocations, and these we affirm.
 
 
 10
 In conducting its first distribution under the Act, however, the Tribunal's treatment of one of the many claimants before it may have violated the procedural requirements of the Government in the Sunshine Act, 5 U.S.C. § 552b (1976), and the Tribunal's own regulations. We therefore remand a small portion of the decision before us-a $50,000 award initially allocated to National Public Radio-for further Tribunal proceedings.
 
 I. BACKGROUND
 
 11
 Cable television is one of a number of technological changes that have recently revolutionized the communications industry in America. Operation of cable systems typically involves the reception of broadcast beams by means of special antennae and transmission of these electronic signals by cable or other methods to the homes of subscribers. In Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), and Teleprompter Corp. v. CBS, Inc., 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974), the Supreme Court held that such reception and distribution of television broadcasts did not constitute a "performance" within the meaning of the Copyright Act of 1909. The Court recognized the commercial impact of its decisions, but concluded that "any ultimate resolution of the many sensitive and important problems in this field ... must be left to Congress." Teleprompter Corp. v. CBS, Inc., 415 U.S. at 414, 94 S.Ct. at 1141.
 
 
 12
 Congress responded to these decisions by enacting Section 111 of the Copyright Act of 1976, 17 U.S.C. § 111 (Supp. III 1979), which requires cable operators to pay royalties to the creators of copyrighted program material that is used by the cable systems. Congress recognized, however, that it would be impractical to require every cable operator to negotiate directly with every copyright owner. See H.R.Rep.No. 1467, 94th Cong., 2d Sess. 89 (1976) (hereinafter cited as House Report). Accordingly, the Act mandates two steps in this process. First, cable operators are required to obtain a copyright license and periodically pay royalty fees into a central fund (the Fund).[1] 17 U.S.C. § 111(c), (d). Second, the Tribunal is then required to
 
 
 13
 distribute royalty fees deposited ... under section 111 and ... determine, in cases where controversy exists, the distribution of such fees.
 
 
 14
 17 U.S.C. § 801(b)(3). The Act requires that the Tribunal render its final distribution decision within one year of the start of these proceedings, and that it state the relevant criteria and facts relied on as well as the reasons for its decision. 17 U.S.C. § 803(b).
 
 
 15
 The Tribunal initiated the first royalty distribution under this scheme in August 1979, concerning cable royalties paid for the 1978 calendar year.[2] The Tribunal divided its proceeding into two "phases," based on the fact that the claimants to the Fund could easily be broken down into specific groups. "Phase I would determine the allocation of cable royalties to specific groups of claimants. Phase II would allocate royalties to individual claimants within each group." 45 Fed.Reg. 63,027 (Sept. 23, 1980). Phase I resulted in the following distribution of the $15 million Fund:
 
 
 16
 The Phase II proceedings were considerably simpler than those in Phase I because all but one of these claimant groups reached voluntary agreement on the allocation of shares within each group. The Tribunal had only to apportion the share of music claimants, and did so as follows:
 
 
 17
 American Society of Composers,
 Authors and Publishers
 (ASCAP) 54%
Broadcast Music, Inc. (BMI) 43%
SESAC, Inc. 3%
 
 
 18
 These distributions were announced in the Tribunal's final decision of September 23, 1980, 45 Fed.Reg. 63,026 (hereinafter cited as Decision).
 
 A. The Claimants
 
 19
 The five cases challenging the Tribunal's Decision can best be understood after identifying the various petitioners.
 
 
 20
 No. 80-2273 is brought by the National Association of Broadcasters (NAB), which represents commercial radio and television broadcasters. The Tribunal rejected NAB's contention that broadcasters deserved a substantial share of the Fund. It awarded the 3.5% share to television broadcasters, and denied any award whatsoever to commercial radio broadcasters on the ground that these retransmissions lacked "any significant marketplace value." Decision at 63,038.
 
 
 21
 No. 80-2284 is brought by the Joint Sports Claimants (JSC), a group that includes professional baseball, basketball, hockey, and soccer leagues. JSC seeks a larger award at the expense of movie producers and program syndicators, but also intervenes in No. 80-2273 to protect its 12% award from the claims of NAB.
 
 
 22
 No. 80-2298 is brought by ASCAP, an unincorporated membership association of writers and publishers of music. ASCAP makes two general claims, contending that music claimants should have received a larger share of the Fund in the Phase I proceeding, and that ASCAP should have received a larger relative share of the 4.5% music award divided by the Tribunal in the Phase II proceeding. ASCAP, BMI, and SESAC, Inc., the claimants in the Phase II proceeding, are "performing rights societies," see 17 U.S.C. § 116(e)(3), which collect licensing fees for distribution to their members. BMI is a corporation that is owned and run by the broadcasting industry. SESAC, Inc. is a family-owned corporation, much smaller than ASCAP or BMI, and has not intervened in this appeal.
 
 
 23
 Nos. 80-2281 and 80-2290 are similar because each is brought on behalf of radio claimants who were denied any award from the Tribunal. The petitioner in the latter case is the Canadian Broadcasting Corporation (CBC), which was established by section 34 of the Canadian Broadcasting Act, Can.Rev.Stat. ch. B-11 (1970). In 1978, CBC was the copyright holder of more than 5,000 hours of television programming for its French and English language networks, and 35,000 hours of AM and FM programming on the four national radio networks. The Tribunal contemplated that CBC would receive a portion of the 3.5% award given to commercial television broadcasters for its television copyrights, but refused to compensate CBC for its radio programming. The final petitioner, National Public Radio (NPR), is a private, non-profit organization that produces news, public affairs, educational, and cultural programming for its 220 member radio stations. These stations resemble the CBC radio stations in the noncommercial nature of their programming. Like CBC, NPR challenges the Tribunal's decision to award no royalties to radio claimants.
 
 
 24
 Identification of several intervenors will also promote comprehension of these cases. The Motion Picture Association of America (MPAA) is a national trade association of motion picture companies engaged in production and distribution of programs to television broadcasters. On this appeal, MPAA also represents syndicators of television programs, such as Hanna-Barbera Productions, King Features Syndicate, and MTM Enterprises, Inc. MPAA intervenes to defend the 75% share award to these groups of claimants and the general soundness of the Tribunal's Decision. In turn, the Tribunal relies heavily on the brief filed by MPAA. See Brief for Respondent Copyright Royalty Tribunal (Tribunal Brief) at 14. Other intervenors are BMI, which opposes the Phase II claims of ASCAP, and the National Collegiate Athletic Association (NCAA), which defends the sports claimants' share against the claims of NAB.
 
 B. The Tribunal's General Approach
 
 25
 The Act instructs the Tribunal to compensate claimants only for "nonnetwork" material that is retransmitted "in whole or in part beyond the local service area of the primary transmitter." 17 U.S.C. § 111(d)(4). This reflects a congressional understanding that copyright owners suffer injury requiring compensation only when the secondary transmissions by cable operators reach markets ordinarily not served by the primary transmitters. See House Report at 90. Network programming, for example, which theoretically is available across the country, is not adversely affected even though it is also available on cable. Similarly, the local retransmission by cable television of a local broadcast merely duplicates programming that is already available in an area. The problem arises because cable systems can pick up broadcasts that are exclusive to one geographical area and carry those broadcasts vast distances into other markets, thereby weakening the copyright holder's ability to exploit his materials elsewhere. The Act therefore was not intended to compensate network broadcasts or even local broadcasters whose programs are retransmitted locally by a cable system in the same area.[3]
 
 
 26
 Aside from these restrictions, however, Congress decided that "it would not be appropriate to specify particular, limiting standards for distribution" of the cable royalties, and to leave the development of such criteria to the Tribunal on the basis of "all pertinent data and considerations presented by the claimants." House Report at 97. The Tribunal concluded that "no mathematical formula or theory or combination of formulas or theories provided a satisfactory basis for the distribution of royalty fees." 45 Fed.Reg. 50,62 1 (July 30, 1980). Accordingly, it decided that the following criteria should guide its allocation of royalty shares:
 
 
 27
 The Tribunal determined the primary factors to be:
 
 
 28
 (a) the harm caused to copyright owners by secondary transmissions of copyrighted works by cable systems,
 
 
 29
 (b) the benefit derived by cable systems from the secondary transmissions of certain copyrighted works, and
 
 
 30
 (c) the marketplace value of the works transmitted.
 
 
 31
 The Tribunal determined the secondary factors to be:
 
 
 32
 (a) quality of copyrighted program material, and
 
 
 33
 (b) time-related considerations.
 
 
 34
 Decision at 63,035.
 
 
 35
 These criteria explain why almost 90% of the Fund was awarded to movie producers, program syndicators, and sports claimants. The Tribunal observed that movies, syndicated programs, and sports events constitute the largest and most profitable segment of programming transmitted by cable systems, and therefore deserved commensurate compensation under the "marketplace value" standard.[4] The lion's share went to movie producers and program syndicators because "by any measure syndicated movies and programs comprise the largest segment of programming" transmitted by cable systems and because of the "great risks" to these producers in a market in which "the high costs of production and the low returns from network licensing make program producers dependent upon syndication to recoup their costs." Decision at 63,037.
 
 II. THE SCOPE OF REVIEW
 
 36
 Although most of the petitioners challenge the Tribunal's action on both substantive and procedural grounds, it seems clear that these claims are motivated essentially by each petitioner's feeling that it deserved a larger share of the Fund. Such reactions flow naturally from the not insignificant consequences of changing one or two percentage points in the distribution of $15 million, and the size of the Fund is expected to grow enormously in future years as cable systems become more widespread.[5]
 
 
 37
 Claims of this sort are generally well beyond the expertise or authority of courts, however, and Congress made clear its awareness of our limitations by making the Tribunal the primary arbiter of these claims. The Tribunal heard some 24 days of testimony on behalf of 474 individual claimants, memorialized in 3,021 pages of transcript with 87 exhibits, during the Phase I proceeding alone. No de novo judicial inquiry into the merits of these proceedings would be constructive, even if it were permitted by the Act. Courts must be particularly cautious where, as here, numerical or percentage results are in issue. In Permian Basin Area Rate Cases, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), the Supreme Court suggested that an agency's choice of a particular number or percentage is not reviewable for exact precision, but simply for broad reasonableness. Even where the statute requires an agency's conclusions to be "supported by substantial evidence," the Court said, "courts are without authority to set aside any rate selected by the Commission which is within a 'zone of reasonableness.' " Id. at 767, 88 S.Ct. at 1360 (quoting FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 585, 62 S.Ct. 736, 742, 86 L.Ed. 1037 (1942)). See National Ass'n of Greeting Card Publishers v. U.S. Postal Service, 607 F.2d 392, 401 (D.C.Cir.1979); Hercules, Inc. v. EPA, 598 F.2d 91, 106 (D.C.Cir.1978).
 
 
 38
 Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high. To reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of the Commission.
 
 
 39
 Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951).
 
 
 40
 At the same time, the Tribunal is not free to apportion the Fund with unbridled discretion. Its allocations must be neither arbitrary nor capricious, and must be supported by substantial evidence. Section 810 of the Act provides that judicial review of the Tribunal's final decisions "shall be had, in accordance with chapter 7 of title 5 (the Administrative Procedure Act), on the basis of the record before the Tribunal." 17 U.S.C. § 810. The Act therefore "provides for the full scope of judicial review provided" by the Administrative Procedure Act, House Report at 179, and this includes review under the "substantial evidence" standard.[6] This standard also leaves room, of course, for "the reviewing court to respect the agency's wide latitude for difficult policy choices." American Public Gas Ass'n v. FPC, 567 F.2d 1016, 1030 (D.C.Cir.1977), cert. denied, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978). The existence of substantial evidence must be determined by reference to the entire record, Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), but substantial evidence is not lacking merely because the agency chooses one conclusion from evidence that arguably supports "two inconsistent conclusions." Consolo v. FMC, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).[7]
 
 
 41
 A similar concern for balancing fairness to the parties against administrative efficiency and expertise informs our review of the Tribunal's procedures. We need not articulate the exact procedures that the Tribunal was required to follow in creating a record for judicial review, see United States v. Florida East Coast Railway Co., 410 U.S. 224, 244-45, 93 S.Ct. 810, 820-21, 35 L.Ed.2d 223 (1973), because the Tribunal's procedures were clearly adequate. The Tribunal provided a full opportunity for all parties to present evidence, to test the evidence of other parties, to submit rebuttal testimony, and to brief issues at various stages of the proceeding. See generally 45 Fed.Reg. at 63,026-28. "(I)n any administrative proceeding, the type of procedure required is related and proportionate to the degree of evidentiary support required for the agency's decision." Mobil Oil Corp. v. FPC, 483 F.2d 1238, 1259 (D.C.Cir.1973). Our assessment of the Tribunal's procedures must consider the difficulties facing the agency and the mandate given it by Congress.[8]
 
 
 42
 These principles of review allow us to deal summarily with many of the general arguments made by the petitioners. We find no error in the distribution criteria selected by the Tribunal,[9] an argument pressed forcefully by NAB, and no inadequacies in the Tribunal's articulation of the bases for its allocations under these criteria.[10] Similarly, we reject the contention that the Tribunal should have articulated these criteria before taking evidence from the parties. The Tribunal was free to structure its proceedings in a reasonable fashion, see FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 143, 60 S.Ct. 437, 441, 84 L.Ed. 656 (1940), and deference is particularly due where courts review statutory interpretations by the agency "charged with the responsibility of setting (the) machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933). The Act explicitly contemplates that the Tribunal will announce its decisional criteria in the "final determination." 17 U.S.C. § 803. See House Report at 97 (recognizing that data and arguments advanced by parties would vitally influence the ultimate criteria used by Tribunal). In any event, the parties can hardly claim ignorance of the Tribunal's concerns during the Phase I evidentiary proceedings. After the parties had presented their direct cases and cross-examination had been concluded, the Tribunal allowed the claimants to supplement their presentations with rebuttal evidence including "any theory or evidence excluded" earlier. Tribunal Order, May 7, 1980, P 1. Many of the relevant criteria were obvious, and had been noted almost from the start.[11] The parties thus had a broad opportunity to adopt or attack the methodologies suggested by other claimants, and therefore had "a reasonable opportunity to know the claims of the opposing party and to meet them." Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938). No claimant was prejudiced more than any other by the fact that the Tribunal was conducting its initial apportionment of the Fund. Neither the Act nor the requirements of due process were violated by the Tribunal conducting that apportionment with the open-mindedness that should accompany the performance of any task for the first time.[12]III. INDIVIDUAL CLAIMS
 
 
 43
 Because these consolidated cases have varying degrees of complexity and merit, we discuss them separately.
 
 A. NAB Claims for Commercial Broadcasters
 
 44
 NAB makes a host of arguments on behalf of commercial television and commercial radio broadcasters. These two groups of claimants were treated quite differently by the Tribunal, but in each case we affirm the Tribunal's decision.
 
 
 45
 NAB suggests several theories that are said to demonstrate that the Tribunal undercompensated commercial television broadcasters. One common strand of these theories is an emphasis on the creative work that goes into a television station's activities.
 
 
 46
 The first theory seeks compensation for each station's "broadcast day as a compilation." NAB argues that cable operators do not retransmit individual programs selectively, but simply pick up the broadcasts of particular stations in their entirety.[13] The broadcast stations expend considerable time and effort in compiling a broadcast day, however, and NAB suggests that this compilation itself falls within the Act's definition of a copyrightable work. The Act defines a "compilation" as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. As NAB emphasizes, such compilations are traditionally afforded copyright protection.[14]
 
 
 47
 The second theory could be considered a more specific application of the first, focusing on the telecast of sports events. The Tribunal awarded a sizeable portion of the Fund to sports claimants after ruling that copyright vests in the athletic teams unless the broadcaster explicitly contracts otherwise.[15] NAB disputes this conclusion on several grounds. It notes that the mere performance of a sport or game could not be copyrighted at common law,[16] and argues that it is only the efforts of the broadcaster that create a copyrightable interest at all.[17] NAB also contends that because copyrights are divisible under the Act, 17 U.S.C. §§ 102, 201(d)(2), broadcasters as well as sports teams should receive some compensation for the telecasts.
 
 
 48
 NAB's general theories are well taken. Although there is some confusion in the legislative history,[18] Congress clearly seemed to contemplate Tribunal recognition of the copyrightable interests claimed by NAB:
 
 
 49
 When a football game is being covered by four television cameras, with a director guiding the activities of the four cameramen and choosing which of their electronic images are sent out to the public and in what order there is little doubt that what the cameramen and the director are doing is what constitutes "authorship."
 
 
 50
 House Report at 52. Anyone who has ever watched ABC's Monday Night Football, for example, knows that the commentary of the announcers and such effects as instant replay in slow motion add immensely to the quality of a sports telecast.[19] Similarly, there is little doubt that the efforts used in juggling programs and compiling a broadcast day constitute a copyrightable interest under the Act.
 
 
 51
 That the interests advanced by NAB are copyrightable does not get broadcasters to the promised land, however. The Tribunal still must address the value of these interests. It is true that the Tribunal has no authority under the Act to ignore valid copyright claims, and we find several somewhat bald statements in the Decision troublesome. See, e.g., Decision at 63,032 ("it is unnecessary for the Tribunal to analyze the ownership and remedies provisions of the Copyright Act"). By any standard, however, the theories advanced by NAB concern interests that are quantitatively de minimis. As the Tribunal observes, the work of television stations in broadcasting sports events and compiling broadcast days has minimal market value because "the public tunes in sports broadcasts mainly to see the sports performance, not the activities of the director and the cameramen." Tribunal Brief at 24. The Decision also observed that "(t)he record is void of any useful evidence that local broadcasters are harmed by cable carriage in distant markets of their locally produced programs," Decision at 63,038, and it is quite possible that distant carriage of local broadcasts is considerably beneficial to television broadcasters because the enlarged audience increases the reach of commercial advertising.[20] The Tribunal's award of 3.5% to commercial television broadcasters clearly falls within the "zone of reasonableness" in terms of compensating broadcasters for their activities. The character of the Tribunal's explanation for that award leaves room for improvement, but NAB's objections are greatly overstated.[21]
 
 
 52
 NAB's second group of arguments concerns the Tribunal's refusal to make any award to commercial radio broadcasters. It is uncontested that cable systems retransmit radio programs as well as television broadcasts, and the Act clearly contemplates that the Fund may be used to compensate "nonnetwork programming consisting exclusively of aural signals" retransmitted beyond the local service area of the original transmitter. 17 U.S.C. § 111(d)(4)(C). Because of inadequacies in the information-gathering procedures implemented by the Copyright Office, however, radio claimants found it almost impossible to establish the distant carriage of their signals.[22] The Tribunal therefore concluded that "(t)he record is inadequate to establish the extent of cable carriage of radio programming," and "fails to show the value of such programming ... or support a finding that the carriage of commercial radio signals is harmful to radio stations." Decision at 63,040.
 
 
 53
 These findings are entirely reasonable. The ubiquity of recorded music may be a blessing of modern times, but this fact works to the disadvantage of commercial radio claimants. As Frank Mankiewicz told the Tribunal during the Phase I proceedings in his capacity as NPR president:
 
 
 54
 Almost all commercial radio systems, or radio stations, have the same sound. I mean-what I'm saying is this, I don't see the value of a cable system, a cable operator, taking the signal of a rock and roll station from Cincinnati, and sending it to, let's say, Detroit, because there are rock stations in Detroit which provide exactly the same sound.
 
 
 55
 Tr. 5/6/80, Joint Appendix (J.A.) 1613. Commercial radio claimants made no showing of the "marketplace value" their signals had to cable systems, and did not suggest that they were harmed by distant carriage of their signals. Indeed, like television broadcasters, radio claimants may even be commercially benefitted by the wider dissemination of their broadcasts. The inability of these claimants to establish the extent to which their signals were retransmitted in distant areas further demonstrates the reasonableness of the Tribunal's decision.
 
 
 56
 NAB contends, however, that the denial of even a token award to radio claimants violates the mandatory language of the Act, "which states that the Tribunal 'shall ' distribute royalties to any copyright owner whose work was distantly carried on a cable system and 'was included in non-network programming consisting exclusively of aural signals.' " Brief for Petitioner NAB (NAB Brief) at 68. It is true, as Justice Cardozo stated in Escoe v. Zerbst, 295 U.S. 490, 493, 55 S.Ct. 818, 820, 79 L.Ed. 1566 (1935), that the word "shall" is "the language of command." See Association of American Railroads v. Costle, 562 F.2d 1310, 1312 (D.C.Cir.1977); National Treasury Employees Union v. Nixon, 492 F.2d 587, 601 (D.C.Cir.1974). The argument quotes the statute out of context, however. Section 111(d)(4) requires that the Fund be distributed "among" designated copyright owners, and makes it clear that royalty recipients must qualify under the terms of that section. It was not arbitrary or capricious for the Tribunal to conclude that commercial radio claimants did not qualify for an award under the criteria set by the Tribunal, nor was it a violation of the statutory commands of the Act.
 
 B. JSC (sports claimants)
 
 57
 The JSC arguments focus on the Tribunal's rejection of the criteria proposed by the sports claimants for apportionment of the Fund, and on whether substantial evidence supports the Tribunal's apportionment decision even under the Tribunal's own criteria. Our discussion in Part II supra explains why neither of these contentions has merit. The Tribunal fully articulated its reasons for allocating a larger share of the Fund to movie and syndicated program copyrights, noting that sports programming has a more "ephemeral" quality:
 
 
 58
 In contrast to owners of movies and syndicated programs which can produce revenues repeatedly in different market situations, once a sports event has been telecast, it is thereafter usually of no further monetary value to the copyright owner.
 
 
 59
 Decision at 63,038. The truth of this observation will appear to anyone who has ever tried to cure insomnia with late-night television reruns, and even JSC seems to concede the point in its brief.[23] Although sports programs may command a higher audience share than most movies or programs, it was not unreasonable for the Tribunal to find that "deficiencies" in JSC's evidentiary presentation undermined its claim to some extent.[24] In view of the wide latitude that Congress gave the Tribunal in allocating cable royalties, the decision to give sports claimants 12% of the Fund is by no means unsupported by substantial evidence.
 
 C. ASCAP music claims
 
 60
 Our observations in Part II supra also explain why we reject ASCAP's first general claim, concerning the total share of the Fund awarded to music claimants. The argument once again comes down to methodology, and the Tribunal's refusal to rely blindly on the data put forward by ASCAP was not unreasonable.[25] The two approaches lead to a difference of only three percentage points of the Fund, and we cannot say that the Tribunal's choice falls outside a zone of reasonableness.
 
 
 61
 ASCAP's second challenge, concerning its relative share of the award to music claimants generally, has somewhat greater force. Two of the five Tribunal members agreed with ASCAP in their dissent from the Phase II determination, and ASCAP makes a succession of strong arguments concerning the strength of its supporting evidence and the weakness of the evidence cited by the Tribunal.[26] It is not necessary to devote considerable attention to this claim, however. The Tribunal did not act unreasonably in concluding that the BMI and ASCAP shares of the music industry have been converging since 1972, and therefore in refusing to allocate the music share between these two claimants along the lines of a more sharply skewed division in that year.[27] As we have emphasized throughout this opinion, the Tribunal's numerical apportionments are entitled to considerable deference, and its decision is not unsupported by substantial evidence merely because other divisions were possible.
 
 
 62
 D. NPR and CBC (noncommercial radio claimants)
 
 
 63
 CBC and NPR, the final two petitioners, present what in many ways are the most difficult questions in this case. Each submitted claims to the Tribunal on behalf of their member stations, and as program originators. Each of these noncommercial radio claimants made a stronger showing that their signals were the subject of distant carriage by cable systems than did commercial radio claimants.[28] The Tribunal acknowledged that noncommercial radio differs greatly from commercial radio because its programs are less duplicative:
 
 
 64
 The record contains testimony that "in almost every community in which a public radio station exists, it provided a service that is not otherwise available" and that the value to a cable system of carrying a public radio station may be greater than "transmitting most commercial radio stations from one market to another because they are almost identical."
 
 
 65
 Decision at 63,040. Nevertheless, the Tribunal declined to make an award from the Fund to the radio stations represented by CBC or NPR.
 
 
 66
 As in the case of commercial radio claimants, however, the chief obstacle faced by NPR and CBC was showing the extent that their programs were the subject of distant carriage by cable systems. NPR argues that this difficulty is not relevant to its right to recover royalties, not only because of the mandatory language of section 111(d)(4) but also because NPR met every threshold showing required by the Tribunal of claimants to the Fund.[29] NPR further argues that the question of whether to grant compensation is qualitatively different than the question of how much that compensation should be. Because Congress created a compensable property interest in works that are the subject of cable retransmission, NPR suggests, the failure to obtain such compensation from the Fund may amount to a violation of the Fifth Amendment. See 122 Cong.Rec. 32,009 (remarks of Representative Danielson) (without royalty compensation, a copyright holder is "denied the exclusive right to his property which is guaranteed by the Constitution"). NPR therefore urges that outright exclusion of claimants be reviewed with more judicial scrutiny than are the Tribunal's percentage allocations. NPR Brief at 28-43.
 
 
 67
 Even under the close scrutiny suggested by NPR, however, we find no error in the Tribunal's action. Several times during the Phase I proceeding, NPR candidly admitted its difficulty in demonstrating that its member stations were the subject of any significant distant carriage by cable systems.[30] A sampling approach to this problem would have been perfectly valid, but the surveys introduced by NPR were incomplete.[31] The Tribunal heard testimony that of some 4,000 FM stations in the country, only 900 are noncommercial and only 213 of these are NPR stations. Only 61 of these NPR stations submitted claims, and a number of these claims concerned retransmissions of an extremely limited scope.[32] CBC's case was diminished by its failure to offer statistical evidence until the Tribunal had moved into Phase II of its proceedings, thus making the proffer untimely. Moreover, it appears that the reliability of the CBC data is not beyond question. See MPAA Brief at 37 n.40 (call numbers of Canadian stations include "a number of non-existent stations and a number of commercial privately owned stations"). In short, the Tribunal's assessment of the evidence in the record put forward to support CBC and NPR claims was not unreasonable.
 
 IV. THE NEED FOR A REMAND
 
 68
 The Tribunal's handling of NPR's claim raises several procedural questions. In July 1980, after the close of its Phase I evidentiary proceedings, the Tribunal issued a "summary statement of its Phase I determination." 45 Fed.Reg. 50,621 (July 25, 1981). Although it observed that "the record made in this proceeding provides no basis for an allocation of royalty fees to commercial radio," id. at 50,622 (emphasis added), the Tribunal initially came to an entirely different conclusion regarding public radio. It stated that "the Tribunal, in its final determination, will provide" an allocation of 0.25% to NPR. Id.
 
 
 69
 After issuing this summary of its determinations, the Tribunal rejected repeated attempts "to reopen Phase I issues to the prejudice of other claimants." It explained:
 
 
 70
 Once the Tribunal has reached such a determination in an adjudication proceeding, it may not be subsequently reversed if the reversal would prejudice the rights of claimants.
 
 
 71
 Decision at 63,039. Apart from three days of hearings on the Phase II issues that concerned only the music claimants, the Tribunal noticed no meetings on the 1978 royalty distribution, and NPR contends that there is no public record of further meetings. NPR Brief at 22.
 
 
 72
 In the final decision, however, the Tribunal restated each of the allocations announced in its earlier summary-with one exception. The award that had been earmarked for NPR was rescinded and added to the 5% that had previously been designated for the Public Broadcast Service (PBS), public television. Only two statements in the Decision refer to this change. The first applies to radio claims generally: "The record is inadequate to establish the extent of cable carriage of radio programming." Decision at 63,040. The second applies specifically to NPR:
 
 
 73
 Prior to the adoption of our final decision in this proceeding, a motion was made and adopted for reconsideration of our award to NPR. Upon reconsideration, a majority of the Tribunal determined that the record in this proceeding is inadequate to support any award to NPR and therefore we have set aside our preliminary determination.
 
 
 74
 Id.
 
 
 75
 NPR attacks this Tribunal action on forceful procedural grounds. The Tribunal's regulations modeled after the Government in the Sunshine Act, 5 U.S.C. § 552b (1976), require that all meetings be preceded by seven days' notice in the Federal Register, that all meetings be open to the public, and that records of all meetings be maintained. 37 C.F.R. § 301.11 (1979). NPR contends that the Tribunal reversed its initial decision in violation of these procedural requirements, and without giving NPR notice of that proposed action or an opportunity to respond. See Morgan v. United States, 304 U.S. 1, 19, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938) (parties are "entitled to be fairly advised of what the Government proposes and to be heard upon its proposals before it issues its final command"). NPR also observes that the Act requires the Tribunal to
 
 
 76
 state in detail the criteria that the Tribunal determined to be applicable to the particular proceeding, the various facts that it found relevant to its determination in that proceeding, and the specific reasons for its determination.
 
 
 77
 17 U.S.C. § 803(b). NPR contends that the summary statement given by the Tribunal for its rescission of the award to NPR was a conclusion rather than a statement of "reasons," see Connecticut Light & Power Co. v. FERC, 627 F.2d 467 (D.C.Cir.1980), and that the rescission is flawed by the Tribunal's failure to explain "why it ha(s) chosen to reject the reasoning of its initial decision." National Ass'n of Food Chains, Inc. v. ICC, 535 F.2d 1308, 1318 (D.C.Cir.1976).
 
 
 78
 We find these procedural arguments troubling. The record would be clearer had NPR filed a motion for reconsideration of these questions, but NPR had no administrative recourse because the Tribunal's rules prohibit the reopening of a proceeding following a final determination.[33] Neither the Tribunal nor the MPAA paid serious attention to NPR's procedural arguments in their briefs, see Tribunal Brief at 28 n.18; MPAA Brief at 39 n.44. But the record reflects no date or notice of the meeting at which "a motion was made and adopted for reconsideration" of the Tribunal's initial award to NPR, and the Tribunal's explanation for that change does seem conclusory. The Sunshine Act states that a court "otherwise authorized by law to review agency action" may "inquire into violations by the agency and afford such relief as it deems appropriate." 5 U.S.C. § 552b(h)(2). We are also required by the Administrative Procedure Act, 5 U.S.C. § 706(2)(D), to set aside agency action found to be "without observance of procedure required by law."
 
 
 79
 Accordingly, that portion of the Tribunal's decision retracting its initial award of 0.25% to NPR and allocating that amount to PBS is remanded to the agency. The Tribunal is instructed to allocate this amount in accordance with its procedural regulations and the requirements of the Sunshine Act, or to explain that it has already done so. See Communications Systems, Inc. v. FCC, 595 F.2d 797 (D.C.Cir.1978) (no violation of Sunshine Act where FCC members do not discuss agenda items at meetings but simply circulate papers and use notation procedures for voting). The Tribunal should also provide a specific statement of the reasons for its allocation of this amount, as required by the Copyright Act, 17 U.S.C. § 803(b). The way is open, of course, for the Tribunal to reinstate its initial allocation to NPR if it returns to the view that substantial evidence supports that allocation. See notes 28 & 29 supra. On the record before us, the apparent procedural flaws in the Tribunal's treatment of NPR do not allow us to affirm its retraction of the 0.25% initial allocation.
 
 CONCLUSION
 
 80
 Congress enacted the Copyright Act of 1976 partly to compensate copyright owners for retransmission of their works by cable systems, thereby creating a property interest that had not hitherto been recognized in the law. The Tribunal faced a difficult task in conducting the initial distribution of cable royalties because of the number of claimants and the inescapably qualitative problem of evaluating their competing claims. It was impossible to satisfy all the claimants, whose combined requests totaled roughly three times more than the finite amount of the Fund. We are satisfied that the Tribunal's resolution of the problem confronting it was reasonable, that its decisional criteria comported with congressional intent, and that its distribution of royalty shares finds rational support in the administrative record.
 
 
 81
 It may be observed that agitation over the Tribunal's initial apportionment has been somewhat overstated. The allocation of the 1978 Fund will not displace the operation of relevant market forces in the future. Now that the Tribunal's methods are known, for example, broadcasters will bargain more knowledgeably with sports teams about telecasts of sports events, and representatives of music, programs, and movies may contract accordingly with television broadcasters. In any event, as the size of the Fund grows, the dispute over how to slice the pie may be more vigorous but it will also be more structured. The umpire has established precedents on which the players may rely in submitting their claims. The Tribunal's decision has achieved an initial allocation of the Fund that is well within the metes prescribed by Congress. With the exception of its retraction of the initial allocation to NPR, which we remand on procedural grounds, its decision is upheld.
 
 
 82
 It is so ordered.
 
 
 
 *
 For the Second Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 The amount of these fees was initially established by the Act, and may be revised in the future by the Tribunal. 17 U.S.C. §§ 111(d), 801(b)(2)
 
 
 [2]
 See 44 Fed.Reg. 47,440 (Aug. 13, 1979) (requesting views on whether Tribunal should declare existence of controversy); id. at 53,099 (Sept. 12, 1979) (declaring controversy and requesting proposals on structure and procedures of distribution proceeding). Several claimants sought preliminary resolution by the Tribunal of disputed legal questions, and the Tribunal complied in late 1979. See 44 Fed.Reg. 75,201 (Dec. 19, 1979). The National Association of Broadcasters (NAB) petitioned for review of these preliminary determinations, but this court dismissed the petition as not ripe for consideration. NAB v. Copyright Royalty Tribunal, No. 80-1076 (D.C.Cir. April 21, 1980)
 Program syndicators and movie
 producers 75 %
Sports leagues 12 %
Television broadcasters 3.25%
Public television 5.25%
Music claimants 4.5 %
 
 
 [3]
 Local carriage is cable retransmission within the "local service area of the primary transmitter" as defined by the rules and regulations of the FCC. 17 U.S.C. § 111(f); see House Report at 88-100. In general, it appears that signals carried more than 100 miles are no longer local. See 122 Cong.Rec. 32,010 (1976) (remarks of Rep. Danielson)
 
 
 [4]
 The Tribunal acknowledges that the notions of "harm" to copyright owners and "benefit" to cable operators also "involve a marketplace-type inquiry." Tribunal Brief at 25 n.17; see Decision at 63,035-36
 
 
 [5]
 Cable royalties are calculated with reference to the gross receipts of the cable system. 17 U.S.C. § 111(d)(2). Cable television is a burgeoning industry, and the fees collected for 1978 through part of 1980 total about $42 million. "The total fund held by the government could be well over $100 million in the not too distant future." Oversight Hearings Before the Subcomm. on Courts, Civil Liberties, and Administration of Justice of the House Comm. on the Judiciary, 97th Cong., 1st Sess. 68 (1981) (statement of Clarence L. James, former Tribunal chairman)
 
 
 [6]
 See Recording Industry Ass'n of America v. Copyright Royalty Tribunal, 662 F.2d 1, 7 & n.16 (D.C.Cir.1981) (discussing legislative history of judicial review provision in the Act)
 
 
 [7]
 Although the "substantial evidence" test is usually considered stricter than the "arbitrary and capricious" test, see Abbott Laboratories v. Gardner, 387 U.S. 136, 143, 87 S.Ct. 1507, 1512, 18 L.Ed.2d 681 (1967), it is not inconsistent for a court to apply both standards in reviewing challenged agency action. See, e.g., Bowman Transportation v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); National Ass'n of Recycling Industries v. ICC, 627 F.2d 1328, 1334 (D.C.Cir.1980); cf. American Public Gas Ass'n v. FPC, 567 F.2d at 1029. Even under the "arbitrary and capricious" standard of review, judicial responsibilities "include ascertaining the facts on which the Tribunal relied in making its decision, determining whether those facts have some basis in the record, and judging whether a reasonable decisionmaker could respond to those facts as the Tribunal did." Recording Industry Ass'n of America v. Copyright Royalty Tribunal, 662 F.2d at 8 (D.C.Cir.1981) (footnote omitted)
 
 
 [8]
 The Act gives the Tribunal considerable freedom to determine its own procedures, see 17 U.S.C. § 803(a), and it has not been suggested that Congress intended to limit the Tribunal to proceedings "on the record" requiring the full formal protections of the Administrative Procedure Act, 5 U.S.C. §§ 556, 557 (1976). Where the Tribunal conducts an informal rulemaking, its decision is subject to judicial review only under the "arbitrary and capricious" standard. Recording Industry Ass'n of America v. Copyright Royalty Tribunal, 662 F.2d at 7-8 (D.C.Cir.1981) (raising royalty ceiling on prices that copyright owners can charge for use of their songs under negotiated contracts). The Tribunal's allocation of royalty funds to copyright owners is clearly more than an informal rulemaking, however. Although the Act does not identify the distribution decision as either rulemaking or adjudication, the Tribunal itself seemed to consider its undertaking "an adjudication proceeding." Decision at 63,039. The Tribunal now contends that it essentially made "industry-wide judgments of a legislative nature," Tribunal Brief at 18 n.12, but the "policy" behind the cable royalty distribution is elaborated fully in the Act and the Tribunal focused on "adjudicative" rather than "legislative" facts in finding eligibility and valuing each particular claim. See Independent Bankers Ass'n of Georgia v. Board of Governors of the Fed. Res. Sys., 516 F.2d 1206, 1215 (D.C.Cir.1975); 1 K. Davis, Administrative Law Treatise § 7.02, at 413 (1958). The substantial evidence standard requires "some sort of adversary, adjudicative-type procedures," Mobil Oil Corp. v. FPC, 483 F.2d 1238, 1259 (D.C.Cir.1973), as may the Due Process Clause. See Wong Yang Sung v. McGrath, 339 U.S. 33, 48-51, 70 S.Ct. 445, 453-54, 94 L.Ed. 616 (1950). As ASCAP observes, however, the Tribunal's apportionment of the Fund has elements of both adjudication and informal rulemaking, Brief for Petitioner ASCAP (ASCAP Brief) at 16, and we find no fault in the procedures followed by the Tribunal here. See 37 C.F.R. § 301.40 et seq
 
 
 [9]
 See Giles Lowery Stockyards v. Dep't of Agriculture, 565 F.2d 321, 324 (5th Cir. 1977), cert. denied, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978) (agency is free to devise ratemaking procedures and standards where Congress has not done so); Amalgamated Meat Cutters and Butcher Workmen of North America v. Connally, 337 F.Supp. 737, 744-47 (D.D.C.1971) (three-judge panel) (Leventhal, J.)
 
 
 [10]
 See Bowman Transportation v. Arkansas-Best Freight System, Inc., 419 U.S. at 286, 95 S.Ct. at 442; Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945) (if "the path which it followed can be discerned," agency will be upheld even if its findings are "summary," "vague," and incorporate by reference exhibits in the record)
 
 
 [11]
 See, e.g., Transcript of Tribunal Proceedings (Tr.) 11/9/78, J.A. 1205 (remarks of Commissioner Brennan); id. 5/5/80, J.A. 1591-93 (remarks of Commissioner Brennan). NAB contends that these comments offered only "minimal guidance," Reply Brief for Petitioner NAB (NAB Reply Brief) at 6, but the fact remains that NAB was prejudiced no more than any other claimant by the flexibility Congress gave the Tribunal in its initial apportionment
 
 
 [12]
 We also reject NAB's suggestion that the Act is unconstitutional as an unlawful delegation of legislative power due to a congressional failure to provide standards governing distribution of the Fund. See NAB Brief at 55-57. Congress did provide general guidance to the Tribunal, through specific statements in the legislative history and in the general philosophy of the Act itself. See generally Decision at 63,035-36; House Report at 90 (cable retransmission is of "direct benefit to the cable system by enhancing its ability to attract subscribers and increased revenues" and "causes damage to the copyright owner by distributing the program in an area beyond that in which it has been licensed")
 
 
 [13]
 See Tr. 5/22/80, J.A. 1694-95, 1701-02. Cable systems do not retransmit individual works, but the entire programming arrangement carried by a station. Moreover, cable systems choose to carry a particular station in lieu of others because of the station's programming as a whole. See Decision at 63,036 ("cable syndicators generally will elect to retransmit those stations which offer a programming mix that has maximum popularity and/or appeal to their subscribers"). The broadcast stations select the optimum mix and arrangement of their programming, based on audience demographics, competing broadcasts, seasonal changes, and "audience flow" from one program to the next. See Tr. 5/22/80, J.A. 1676-77
 
 
 [14]
 See, e.g., Roy Export Co. Establishment of Vaduz v. CBS, Inc., 503 F.Supp. 1137 (S.D.N.Y.1980) (compilation of excerpts from pre-existing copyrighted films is proper subject for new and separate copyright); New York Times Co. v. Roxbury Data Interface, Inc., 434 F.Supp. 217, 220 (D.N.J.1977) (copyright on Times Index protects correlation of data with citations to pages and columns of newspaper on which data appear); Jacobs v. Robitaille, 406 F.Supp. 1145, 1149 (D.N.H.1976) (compilation of classified advertisements is separately copyrightable)
 
 
 [15]
 The Tribunal concluded that the legislative history of the Act demonstrated "a clear course of action by the Congress, and indeed by the broadcasting representatives, which compels the award of cable royalties for sports programming to the sports leagues, in the absence of contractual arrangements specifically providing that such royalties shall be distributed to broadcast claimants." Decision at 63,035. Although the Tribunal gave NAB an opportunity to submit such contractual evidence, NAB did not make an "offer of proof" until Phase II of the proceedings. See id. at 63,039. It was not unreasonable for the Tribunal to conclude that the NAB submission was untimely, especially because it was not even clear that the NAB's evidence was relevant to the issue for which the proffer was made. See Tr. 8/21/80, J.A. 1919-71
 
 
 [16]
 See, e.g., Sinatra v. Goodyear Tire & Rubber Co., 435 F.2d 711 (9th Cir. 1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1376, 28 L.Ed.2d 646 (1971); Booth v. Colgate-Palmolive Co., 362 F.Supp. 343 (S.D.N.Y.1973); 1 D. Nimmer, Copyright § 2.18(H)(3) (1980). At the same time, sports clubs did own a property interest in their games and could sell that right as they saw fit. See, e.g., Ettore v. Philco Television Broadcasting Co., 229 F.2d 481, 487 (3d Cir.), cert. denied, 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956); Pittsburgh Athletic Co. v. KQV Broadcasting Co., 24 F.Supp. 490, 492 (W.D.Pa.1938). Cf. Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 575, 97 S.Ct. 2849, 2857, 53 L.Ed.2d 965 (1977)
 
 
 [17]
 This appears to have been the understanding of Congress. In testimony during hearings on the Act, Barbara Ringer, then Register of Copyrights, expressed doubt that "the game itself, as a game, and activities of the participants, the players, are actually copyrightable." Hearings on H.R. 2223 Before the Subcomm. on Courts, Civil Liberties, and the Administration of Justice of the House Comm. on the Judiciary, 94th Cong., 1st Sess. 1823 (1975) (hereinafter cited as 1975 Hearings ). See generally note 16 supra. At the urging of the sports leagues, Congress afforded copyright protection to live sports programming by devising an appropriate definition of "fixation" in 17 U.S.C. § 102. "The committee was persuaded that ... the content of a live transmission should be regarded as 'fixed' and should be accorded statutory protection if it is being recorded simultaneously with its transmission." House Report at 45 (emphasis added). Before the Tribunal, even JSC conceded that "a copyrightable sports telecast is the joint creation of the broadcaster and sports club alike." JSC Reply Brief, November 28, 1979, J.A. 180
 
 
 [18]
 The legislative history abounds with statements that can be taken to support the claims of the sports leagues as well as the broadcasters. Compare 1975 Hearings, supra note 17, at 1832 (testimony of Barbara Ringer) ("I think that broadcasts of sporting events," including "the contributions of the cameraman, director, and to some extent the people that direct the halftime events," contain "copyrightable elements") and House Report at 52 (these activities constitute "authorship") with 1975 Hearings, supra note 17, at 798 (testimony of Bowie K. Kuhn, Commissioner of Baseball) (baseball teams are "the copyright holder") and id. at 785 (NAB general counsel "guessing" that the sports club or league is the copyright holder)
 This confusion may be attributable to the fact that neither the broadcasters nor sports interests initially sought a cable royalty scheme when legislation governing cable retransmission was first proposed more than a decade ago. The broadcasters focused on the unfair competition said to result from the ability of cable systems to transmit at no cost programs that broadcasters could obtain only by paying license fees. See, e.g., 1975 Hearings, supra note 17, at 1377 (testimony of NAB's general counsel). The sports leagues were also less concerned with securing royalties than with preventing cable transmissions in markets that had been "blacked out." See, e.g., Hearings on H.R. 4347 Before Subcomm. No. 3 of the House Comm. on the Judiciary, 89th Cong., 1st Sess. 1832 (1965) (testimony of Joe Foss, Commissioner of the American Football League); 1975 Hearings, supra note 17, at 788-90 (testimony of Bowie Kuhn). But Congress explicitly rejected the approach proposed by the sports leagues, see 120 Cong.Rec. 30,489-90 (1974), and the legislative history is thus hardly dispositive of the question how royalties for sports broadcasts should be divided between broadcasters and professional sports.
 
 
 [19]
 The activities of some commentators may receive as much notoriety as the games. See, e.g., Business Week, March 26, 1979, at 14 (discussing banter of Howard Cosell and Don Meredith); Newsweek, May 5, 1975, at 57 (same). Network programming is not protected by the Act, of course, but local telecasts also benefit from the efforts of local commentators. The Tribunal observed that "broadcasters of sports events normally produce and direct the sports coverage, and therefore make a creative contribution to the ultimate product." Tribunal Brief at 22-23
 
 
 [20]
 17 U.S.C. § 111(c)(3) prohibits cable systems from altering commercials carried on retransmitted programs. See House Report at 93-94 (substitution or other commercials would harm advertisers and therefore copyright owners of original broadcasts). Cable retransmission therefore enlarges a television station's audience and increases the value of station advertising, whereas it clearly harms sports performers. See 1975 Hearings, supra note 17, at 817-25 (testimony of John O. Coppedge on behalf of NCAA) (impact of cable retransmission of college sports on broadcast revenues and stadium attendance at college games, and in turn on athletic programs dependent on those revenues)
 
 
 [21]
 NAB's final argument in its barrage of claims is that the Tribunal erred in not granting broadcasters compensation for cable retransmission within the local service area of syndicated programs for which the station held an exclusive license. NAB Brief at 41-48. These exclusivity agreements may be enforced against cable systems, see House Report at 123, but the appropriate avenue of relief is to force cable systems to delete certain syndicated programming from distant signals imported into the exclusive broadcast area under the FCC's exclusivity rules, 47 C.F.R. § 76.151 et seq. (1977), and not through royalty compensation
 
 
 [22]
 The Statements of Account filed by cable systems with the Copyright Office pursuant to 17 U.S.C. § 111(d)(2)(A) reflect distant carriage of television signals only. Although Copyright Office regulations instruct cable systems to list the FM radio stations they can receive, 37 C.F.R. §§ 201.11, 201.17, most systems apparently do not comply. Tr. 5/5/80, J.A. 1630-32; NPR Brief at 8. Even if specific stations are listed, the Statement of Account forms do not require designation of whether the signals are "distant" or "local."
 
 
 [23]
 Brief for Petitioner JSC (JSC Brief) at 30. JSC argues that this "ephemeral" quality demonstrates the "special value" of sports programming, but this conclusion does not follow automatically. Indeed, the harm alleged by JSC is not the inability to exploit its copyrighted product in other markets, but the cable retransmission of telecasts "into areas where (JSC claimants) did not want those programs to be shown." JSC Brief at 6. See generally note 18 supra (Congress rejected argument that sports leagues should be given "blackout" protection)
 
 
 [24]
 Decision at 63,037-38. The JSC claim for 25-30% of the Fund was primarily based on a survey asking 20 cable operators how they would spend a hypothetical $100 for programming allocated among "live professional sports, movies, syndicated series programs, and local news and public affairs programs." The response suggested an average allocation of $27 for live sports programming, but the term "live professional sports" specifically included sports broadcasts by the networks. Tr. 4/24/80, J.A. 1453-54. The Tribunal properly concluded that the inclusion of network programming grossly overvalued the sports programming subject to compulsory license fees. See text at note 3 supra. Other evidence suggested that local sports programming amounted to only 5% of the distant signal carriage by cable systems in 1978, Tr. 4/24/80, J.A. 1437, and the Tribunal properly increased this percentage to allow for the 11% share of viewing commanded by such programming. See id., J.A. 1439-40 (A.C. Nielsen survey)
 
 
 [25]
 ASCAP relied on FCC data showing the amount of music license fees paid by commercial television stations for different types of copyrighted materials, and argued that music claimants' share of the Fund should be the same as the percentage of those fees paid for music. See ASCAP Brief at 17-19. But the ASCAP figures omitted six of the nine items of programming expense contained in the FCC financial reports on which ASCAP relied. Decision at 63,040. It was not unreasonable to consider all nine categories, because expenses such as salaries for employees could be considered costs of creating the station 's own copyright. Moreover, there are problems in assuming that the amounts paid for music license fees actually represent a judgment about the value of music to cable, in part because these fees are based on blanket licensing arrangements. See generally BMI, Inc. v. CBS, Inc., 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). Finally, as an ASCAP witness conceded, it was difficult for the Tribunal to identify the "harm" caused to music copyright holders by cable retransmission. Tr. 3/31/80, J.A. 1334. The Tribunal therefore properly adjusted the share of music claimants in accordance with its distribution criteria
 
 
 [26]
 The Tribunal cited a variety of evidence to support its Phase II allocation, including (a) a BMI survey showing that BMI licensed 46% of music on local television in 1978; (b) fee schedules dividing music royalty fees from public broadcasters between BMI and ASCAP on a 50-50 basis, see 43 Fed.Reg. 25,068-69 (1978); (c) fee schedules dividing music royalty fees from educational institutions on a 6-5 basis; (d) a voluntary agreement between ASCAP and BMI distributing jukebox royalties on a 50-50 basis; and (e) BMI evidence showing that it had more than 50% of AM radio performances and almost 50% of FM radio performances. Decision at 63,041. ASCAP contends that the voluntary jukebox agreement was expressly made to be "without prejudice" in other fee divisions, ASCAP Brief at 28-29, and that the Tribunal had explicitly stated that its division of music fees from public broadcasting stations would not "establish a precedent." 43 Fed.Reg. at 25,069. ASCAP also argues that data concerning radio fees was irrelevant because radio claimants were denied any share of the Fund, ASCAP Brief at 25-26, that data concerning music fees from educational institutions was erroneous, id. at 33-35, and that BMI's survey concerning local television fees was seriously flawed in giving equal weight to performances of unequal value. "(A) few seconds of background music was counted as if it were of equal value to a theme performance or even a 5-minute feature performance." ASCAP Reply Brief at 7
 
 
 [27]
 ASCAP's claim was based on the fact that in 1978 it received roughly 63% of the music license fees paid by local television. As BMI noted, however, these fees were based on a contract between ASCAP and BMI that was negotiated in 1972 based on data from the 1960s. Brief for Intervenor BMI at 8-11. The evidence outlined in note 26 supra clearly "reflected a modest general improvement in BMI's posture" since 1972. Tribunal Brief at 30, and ASCAP's objections do not eliminate the substantial weight of this evidence. The radio data, for example, clearly "is of some value in assessing the total contemporary role of the respective performing rights societies," Decision at 63,041, even though radio claimants did not prove their own entitlement to a royalty award. See pp. 382-383 infra. The Tribunal treated the public broadcasting fee division not as a "precedent" but as a factor worthy of "limited weight," Decision at 63,041, and was not bound by ASCAP's agreement with BMI that the jukebox agreement would be without prejudice
 
 
 [28]
 NPR cited at least one instance of distant carriage for each of its 61 member stations submitting claims. NPR letter of July 31, 1979, J.A. 1031-37. CBC argued that any retransmission of its readily identified signals more than 150 miles from the Canadian border constituted distant carriage, and offered to compile statistical data as to the number of cable systems transmitting such signals. CBC letters of July 27, 1979, and March 14, 1980, J.A. 479, 508-15
 
 
 [29]
 The Tribunal's rule for filing claims required identification "of at least one secondary transmission establishing a basis for the claim." 37 C.F.R. § 302.7(b)(4) (1979). When some claimants urged the Tribunal to seek more complete listings, the Tribunal found that it would be "inconsistent" with its desire to proceed "simply and expediently" to require full listings and supporting statistics. 44 Fed.Reg. 29,892-93 (1979). Moreover, the Tribunal presumed benefit to the cable operator and harm to the copyright owner from the mere fact of carriage
 Although some claimants offered no specific financial evidence but only generalized statements in support of their claim of harm from the importation of distant programs, we conclude that most claimants in varying degrees have sustained harm....
 The Tribunal concluded that there is no readily available measure or gauge in quantitative terms of the benefit derived by cable systems from the carriage of particular programs.
 Decision at 63,035, 63,036. The Tribunal also heard evidence that cable carriage of distant NPR signals harms NPR by reducing the growth of new public radio stations and by diminishing community support for existing stations by making it more difficult for local stations to conduct their annual fund-raising drives. Tr. 5/5/80, J.A. 1621-22, 1648. The Tribunal's initial allocation to NPR was apparently based on these considerations. See Summary Statement of Phase I Determinations, 45 Fed.Reg. 50,622 (July 30, 1980).
 
 
 [30]
 An NPR witness acknowledged NPR's burden to present persuasive evidence in support of its theory of how the Fund should be distributed, Tr. 5/6/80, J.A. 1652, but NPR witnesses also conceded the difficulty of making such a showing. See id., J.A. 1608 ("we don't want the Tribunal to feel that this is based upon a detailed and comprehensive examination of data that is very difficult to find, and indeed may turn out, in our ultimate examination, hardly to exist at all"); id., J.A. 1631 ("as much as I would have loved to have had some hard and fast statistics and to come in here with a percentage that I could justify with all kinds of confidence, I could not find such")
 
 
 [31]
 NPR claims that it "submitted evidence on the extent of cable systems' distant carriage of NPR station signals," NPR Brief at 16. This evidence consisted of (a) a 1977 FCC finding that 51% of all cable systems carry "all-band" FM signals, see Cable Radio Report and Order, 67 F.C.C.2d 491, 501 (1978); (b) a 1976 NAB study in which 58% of the radio stations polled reported cable importation of "distant radio signals" into their local markets; and (c) an NPR random sample of cable systems showing that 72% of the NPR stations carried by the sampled systems were imported from distant communities. NPR Proposed Findings of Fact, J.A. 408. But NPR concedes that "there is no explicit evidence of the definition of 'distant' used by the NAB," NPR Brief at 18 n.31, and it should be noted that the term "distant radio signals" does not necessarily include NPR signals. Similarly, cross-examination of NPR's claims by JSC suggested that "all-band" carriage may be local as well as distant, Tr. 5/6/80, J.A. 1646, and again this term need not necessarily include NPR broadcasts. In short, although 72% of the NPR stations carried by the sampled cable systems were imported from distant communities, the Tribunal had no way of knowing how many NPR stations are carried on how many cable systems-and thus had no total against which to apply the 72% figure
 
 
 [32]
 See Tr. 5/6/80, J.A. 1609. For example, the Tribunal heard evidence that two cable systems, with 9,692 and 11,606 subscribers respectively, had only 27 and 200 customers subscribing to the systems' FM service. Id., J.A. 1611
 
 
 [33]
 37 C.F.R. § 301.76 (1979) ("Following the publication of a final determination in the Federal Register, the Tribunal shall not reopen or conduct any further proceedings")