The CHRISTIAN BROADCASTING NETWORK, INC., Appellant,

v.

The COPYRIGHT ROYALTY TRIBUNAL, Appellee,

Major League Baseball, et al., Multimedia Program Productions, Inc., Motion Picture Association of America, Inc., et al., National Public Radio, Superstation, Inc., National Association of Broadcasters, Broadcast Music, Inc., Old-Time Gospel Hour, American Society of Composers, Authors and Publishers, Spanish International Network, Inc., Canadian Broadcasting Corporation, Public Broadcasting Service, et al., Intervenors.

OLD–TIME GOSPEL HOUR, Appellant,

v.

COPYRIGHT ROYALTY TRIBUNAL, Appellee,

Multimedia Program Productions, Inc., Motion Picture Association of America, Inc., et al., National Public Radio, Superstation, Inc., National Association of Broadcasters, Broadcast Music, Inc., American Society of Composers, Authors and Publishers, Major League Baseball, et al., Christian Broadcasting Network, Spanish International Network, Inc., Canadian Broadcasting Corporation, Public Broadcasting Service, et al., Intervenors.

PTL TELEVISION NETWORK, Appellant,

v.

COPYRIGHT ROYALTY TRIBUNAL, Appellee,

Major League Baseball, et al., Multimedia Program Productions, Inc., Motion Picture Association of America, Inc., et al., National Public Radio, Superstation, Inc., National Association of Broadcasters, Broadcast Music, Inc., Old-Time Gospel Hour, American Society of Composers, Authors and Publishers, Christian Broadcasting Network, Spanish International Network, Inc., Canadian Broadcasting Corporation, Public Broadcasting Service, et al., Intervenors.

The NATIONAL ASSOCIATION OF BROADCASTERS, Petitioner,

v.

COPYRIGHT ROYALTY TRIBUNAL, Respondent,

Multimedia Program Productions, Inc., Motion Picture Association of America, Inc., et al., National Public Radio, Superstation, Inc., Broadcast Music, Inc., Old-Time Gospel Hour, American Society of Composers, Authors and Publishers, Major League Baseball, et al., Christian Broadcasting Network, Inc., Spanish International Network, Inc., Canadian Broadcasting Corporation, Public Broadcasting Service, et al., Intervenors.

The MOTION PICTURE ASSOCIATION OF AMERICA, INC., Its Member Companies, and Other Program Producers and Distributors, Petitioners,

v.

COPYRIGHT ROYALTY TRIBUNAL, Respondent,

National Public Radio, Superstation, Inc., Broadcast Music, Inc., National Association of Broadcasters, Old-Time Gospel Hour, Multimedia Program Productions, Inc., American Society of Composers, Authors and Publishers, Major League Baseball, et al., Christian Broadcasting Network, Spanish International Network, Inc., Canadian Broadcasting Corporation, Public Broadcasting Service, et al., Intervenors.

SPANISH INTERNATIONAL NETWORK, INC., Appellant,

v.

COPYRIGHT ROYALTY TRIBUNAL, Appellee,

National Association of Broadcasters, Motion Picture Association of America, Inc., et al., Multimedia Program Productions, Inc., Superstation, Inc., American Society of Composers, Authors and Publishers, Major League Baseball, et al., Broadcast Music, Inc., Christian Broadcasting Network, Canadian Broadcast-

ing Corporation, Public Broadcasting Service, et al., Intervenors.

Nos. 82–1312, 82–1326, 82–1327, 82–1371, 82–1372 and 82–1383.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 14, 1982.

Decided Oct. 25, 1983.

W. Thad Adams, III, Charlotte, N.C., for appellant PTL Television Network in 82–1327.

Victor E. Ferrall, Jr., Washington, D.C., with whom John I. Stewart, Jr., Robert M. Halperin, Erwin G. Krasnow and Michael D. Berg, Washington, D.C., were on the brief for petitioner/intervenor National Association of Broadcasters in 82–1371, 82–1312, 82–1326, 82–1327, 82–1372 and 82–1383. James J. Popham, Washington, D.C., also entered an appearance for the National Association of Broadcasters.

Donald A. Kaul, Washington, D.C., with whom Shelley R. Grant and Edwina Dowell, Washington, D.C., were on the brief for petitioner/intervenor Spanish International Network, Inc., in 82–1383, 82–1312, 82–1326, 82–1327, 82–1371 and 82–1372.

Grover C. Cooper, Clifford M. Harrington and Richard J. Bodorff, Washington, D.C., were on the brief, for appellant/intervenor The Christian Broadcasting Network, Inc., in 82–1312, 82–1326, 82–1327, 82–1371, 82–1372 and 82–1383.

John H. Midlen, Jr., Washington, D.C., was on the brief for petitioner/intervenor Old-Time Gospel Hour in 82–1326, 82–1312, 82–1327, 82–1371 and 82–1372.

Bruce G. Forrest, Atty., Dept. of Justice, Washington, D.C., with whom William Kanter, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellee/respondent Copyright Royalty Tribunal.

James F. Fitzpatrick, David H. Lloyd, Robert Alan Garrett and Vicki J. Divoll for Major League Baseball, Philip R. Hochberg for National Basketball Association, et al., and Robert Coll for National Hockey League and Judith Jurin Semo, Washington, D.C., for National Collegiate Athletic Association, were on the joint brief for intervenors Major League Baseball, et al., in 82–1312, 82–1326, 82–1327, 82–1371, 82–1372 and 82–1383.

Arnold P. Lutzker, Washington, D.C., was on the brief for intervenor Multimedia Program Productions, Inc., in 82–1312, 82–1326, 82–1327, 82–1371, 82–1372 and 82–1383.

Dennis Lane, Washington, D.C., with whom Arthur Scheiner, Washington, D.C., was on the brief for petitioners/intervenors Motion Picture Association of America, Inc., et al., in 82–1372, 82–1312, 82–1326, 82–1327, 82–1371 and 82–1383.

Bernard Korman and I. Fred Koenigsberg, New York City, were on the brief for intervenor American Society of Composers, Authors and Publishers in 82–1312, 82–1326, 82–1371, 82–1372 and 82–1383. Benjamin L. Zelenko, Washington, D.C., also entered an appearance for American Society of Composers, Authors and Publishers.

Charles T. Duncan, Michael W. Faber, Joel S. Winnik and Amy Grossman Applegate, Washington, D.C., were on the brief for intervenor Broadcast Music, Inc., in 82–1312, 82–1326, 82–1327, 82–1371, 82–1372 and 82–1383.

Malcolm A. Hoffmann, New York City, was on the brief for intervenor Canadian Broadcasting Corporation in 82–1312, 82–1326, 82–1327, 82–1371, 82–1372 and 82–1383.

Lawrence A. Horn, Jacqueline Weiss and Gene A. Bechtel, Washington, D.C., were on the brief for intervenor Public Broadcasting Service in 82–1312, 82–1326, 82–1327, 82–1371, 82–1372 and 82–1383.

Jamie S. Gorelick, David O. Stewart and Janice F. Hill, Deputy Gen. Counsel, Washington, D.C., were on the brief for intervenor National Public Radio in 82–1312, 82–1326, 82–1327, 82–1371 and 82–1372.

Robert F. Corazzini and Peter H. Feinberg, Washington, D.C., for intervenor Superstation, Inc., in 82–1312, 82–1326, 82–1327, 82–1371, 82–1372 and 82–1383.

Before ROBINSON, Chief Judge, WILKEY and MIKVA, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Pursuant to the 1976 Copyright Act (the Act), 17 U.S.C. § 101–810 (Supp. V 1981), cable television systems may, by following specified procedures, retransmit certain copyrighted programming to their subscribers without incurring liability for copyright infringement. To avoid liability, however, cable systems must obtain a compulsory license for their operations, in part by paying royalty fees into a central fund (the Fund). This Fund is distributed annually by a federal agency, the Copyright Royalty Tribunal (the Tribunal), among copyright owners whose works were retransmitted by cable. The Tribunal's first distribution determination, for calendar year 1978, was affirmed in almost all respects by this court in *National Association of Broadcasters v. Copyright Royalty Tribunal (NAB v. CRT)*, 675 F.2d 367 (D.C.Cir.1982). The consolidated cases now before us present various challenges to the Tribunal's second annual distribution, for calendar year 1979. With several important exceptions, we affirm the Tribunal's 1979 determination.

## I. BACKGROUND

The 1976 Copyright Act requires that, each July, every copyright owner "claiming to be entitled to [the] compulsory license fees [deposited in the Fund] shall file a claim with the Copyright Royalty Tribunal...." 17 U.S.C. § 111(d)(5)(A). The Act specifically provides that these claimants, notwithstanding any provision of the antitrust laws, "may agree among themselves as to the proportionate division of [the Fund] ... [and] may lump their claims together and file them jointly or as a single claim, or may designate a common agent to receive payment on their behalf." *Id.* If, however, after the first day of August of each year, the Tribunal finds that no such agreement has been reached, the Tribunal must declare a "controversy" and conduct a "proceeding" to determine the appropriate distribution of the Fund. *Id.* § 111(d)(5)(B).

After soliciting comments from copyright owners in October 1980 and hearing arguments at a public meeting one month later, the Tribunal declared the existence of a controversy concerning the distribution of cable royalty fees for calendar year 1979. *See* 45 Fed.Reg. 71,641 (1980) (directing claimants to file comments); 46 Fed.Reg. 14,153 (1981) (declaring existence of controversy effective Mar. 2, 1981). Shortly thereafter, the Tribunal announced that its 1979 proceeding would be conducted in two separate phases (as had been its 1978 pro-

ceeding). Phase I was to allocate percentages of the Fund among various groups of claimants; Phase II was to resolve disputes, if any, among claimants within each group. 46 Fed.Reg. 24,619 (1981).

Following forty-two days of evidentiary hearings, the Tribunal concluded Phase I of its proceedings by allocating the $20.6 million Fund among several claimant groups:

| | |
|---|---|
| Program syndicators and movie producers | 70% |
| Joint sports claimants | 15% |
| Public Broadcasting Service | 5.25% |
| U.S. television broadcasters | 4.50% |
| Music performing rights societies | 4.25% |
| Canadian television broadcasters | 0.75% |
| National Public Radio | 0.25% |
| Commercial radio | 0.00% |

46 Fed.Reg. 58,545 (1981) (summary of Phase I). The Tribunal's Phase II proceedings involved, almost entirely, a dispute within the program syndicators and movie producers group. After holding an additional seven days of evidentiary hearings, the Tribunal allocated shares within this group as follows:

*Program Syndicators [and Movie Producers]:*

| | |
|---|---|
| Motion Picture Association of America | 96.8% |
| Multimedia Program Productions, Inc. | 1.6% |
| National Association of Broadcasters | 0.8% |
| Spanish International Network | 0.7% |
| Mutual of Omaha | 0.1% |
| Christian Broadcasting Network | 0.0% |
| PTL Television Network | 0.0% |
| Old-Time Gospel Hour | 0.0% |

47 Fed.Reg. 9,879 (1982); *see also id.* (noting existence of minor disputes within the music claimants and U.S. television broadcasters groups that failed to result in any Phase II awards). The Tribunal's rationale for both its Phase I and Phase II determinations was published in the Tribunal's March 8, 1982 Notice of Final Determination, 47 Fed.Reg. 9,879 (hereinafter cited as Decision).

## A. The Positions of the Claimants

. The six cases that now challenge the Tribunal's 1979 Decision can best be understood while identifying the various petitioners and intervenors.

No. 82–1372 is brought by the Motion Picture Association of America (MPAA), a national trade association of major motion picture companies (Metro-Goldwyn-Mayer, United Artists, etc.) which engage in the production and distribution of movies and other programs to television broadcast stations. In this case, MPAA also represents most of the program syndicators (MTM Enterprises, Sandy Frank Film Syndication, etc.) which engage in the business of selling the broadcast rights for television series or movies to a number of broadcast stations. MPAA criticizes the Tribunal for awarding the program suppliers only 70% of the Phase I allocation, especially vis-a-vis the Tribunal's awards to the Joint Sports Claimants and T.V. Broadcasters. The MPAA also criticizes the Tribunal's Phase II allocations to program suppliers other than MPAA, but has filed a separate intervenor's brief defending the Tribunal's Phase II allocations to the extent that they went to MPAA.

Nos. 82–1213, 82–1326, 82–1327 are brought by the Christian Broadcasting Network, Old-Time Gospel Hour, and PTL Television Network, owners of syndicated programs with religious themes. These organizations, referred to by the Tribunal as "Devotional Claimants," all object to the Tribunal's failure to award them any percentage at all of the Phase II distribution among program suppliers and movie producers. Although each of these organizations raises several distinct arguments, all of the Devotional Claimants assert that the Tribunal arbitrarily dismissed their claims for reasons that were not applied evenly to non-religious, but similarly situated, claimants. As a corollary to this argument, the Devotional Claimants maintain that the Tribunal failed to adequately explain its failure to award them any share of the Phase II distribution.

No. 82–1371 is brought by the National Association of Broadcasters (NAB), representing commercial radio and television stations. NAB objects to the Tribunal's Phase I determination on two grounds: (1) its failure to award television broadcasters a share for their "authorship" of sports tele-

casts; and (2) its failure to make any award to commercial radio. In contrast to these objections, NAB files an intervenor's brief defending the Tribunal's Phase I award of 4.5% to U.S. commercial television and its Phase II award of 0.8% to NAB (for station-syndicated programming) from attack by MPAA and the Devotional Claimants.

No. 82–1383 is brought by the Spanish International Network (SIN), a producer and syndicator of Spanish language television programs. SIN seeks to increase its 0.7% Phase II allocation at the expense of the Tribunal's Phase II award to MPAA. The MPAA's intervenor brief supports the Tribunal's decision not to award SIN a larger allocation. The Devotional Claimants, especially the PTL Television Network (PTL), attack the Phase II award to SIN in light of the Tribunal's failure to allocate a share to PTL for its Club-PTL Spanish language program.

In addition to the intervenor's brief of MPAA and NAB (described above), several other parties have also intervened. The Joint Sports Claimants (JSC), a group that includes the National Collegiate Athletic Association and various professional baseball, basketball, hockey, and soccer leagues, intervenes to defend its Phase I award of 15% from attack by MPAA and NAB. Multimedia Program Productions, Inc., a non-MPAA owner of television series and specials (including *Donahue* and *Young People's Specials*), intervenes to defend its Phase II award of 1.6% from attack by MPAA. The Public Broadcasting Service (PBS) intervenes to defend its Phase I award of 5.25% from attack by MPAA and the Devotional Claimants. Other intervenors are the American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI), intervening in defense of the Tribunal's Phase I award to the music claimants, and the Canadian Broadcasting Corporation (CBC), which intervenes to criticize the Tribunal's failure to award a share to commercial Canadian radio broadcasters.

Altogether, the petitioners raise a host of procedural and substantive challenges to the Tribunal's 1979 Decision. At the outset, however, there is ample reason to reiterate this court's observation in *NAB v. CRT*:

> it seems clear that these claims are motivated essentially by each petitioners feeling that it deserved a larger share of the Fund. Such reactions flow naturally from the not insignificant consequences of changing one or two percentage points in the distribution of $15 million [$20 million in 1979], and the size of the Fund is expected to grow enormously in future years as cable systems become more widespread.

675 F.2d at 374 (footnote omitted). In the present cases, moreover, many of the parties' positions are further explained by a comparison of the Tribunal's 1978 and 1979 determinations:

| 1978 | | 1979 | |
|---|---|---|---|
| Syndicators & producers | 75% | Syndicators & producers | 70% |
| Sports claimants | 12% | Sports claimants | 15% |
| T.V. broadcasters | 3.25% | T.V. broadcasters (U.S.) | 4.5% |
| Public television | 5.25% | Public television | 5.25% |
| Music claimants | 4.5% | Music claimants | 4.25% |
| | | Canadian broadcasters | 0.75% |
| | | National Public Radio | 0.25% |

*See* 47 Fed.Reg. 9,879 (1982) (announcing 1979 distribution); 45 Fed.Reg. 63,026 (1980) (announcing 1978 distribution). Thus, for example, MPAA has switched from being a defender of the Tribunal's 1978 determination (75% to producers and syndicators) to being a challenger of its 1979 determination (70% to producers and syndicators). Conversely, JSC now intervenes in defense of the Tribunal's Decision (15% to sports claimants), whereas last year it sought a larger award at the expense of the producers and syndicators (12% to sports claimants). NAB, although criticizing the 1979 Decision in some respects, otherwise praises the Tribunal's sagacity for increasing the award to U.S. television broadcasters from their 1978 percentage.

The parties' manifest self interest does not, of course, diminish their status as petitioners for judicial review of the Tribunal's Decision. We discuss the merits of their claims below. But each claimant's focus on its own slice of the Fund does help to illuminate the complex nature of the task with which the Tribunal was faced. Had each Phase I claimant been awarded its desired

allocation, the Phase I distribution would have totalled over 160% of the Fund's available deposits; similarly, satisfying all Phase II claims made by producers and syndicators would have required over 125% of that group's Phase I distribution. These mutually exclusive claims to the $20 million Fund explain, in practical terms, what this litigation is all about.

### B. *The Tribunal's Approach*

In evaluating the parties' competing claims to the Fund, the Tribunal operates with very little substantive guidance from Congress. The only limitation in the 1976 Copyright Act is that the Tribunal must restrict its distribution awards to copyright owners "whose work[s] [were] included in a secondary transmission made by a cable system of a *nonnetwork* television program ... *beyond the local service area of the primary transmitter.*" 17 U.S.C. § 111(d)(4)(A) (Supp. V 1981) (emphasis added). As we explained in *NAB v. CRT,* this restriction reflects a congressional understanding that copyright owners should be compensated for their inability, due to cable retransmission, to exploit their materials in "distant" markets; because cable retransmission of *network* programming does not weaken the owners' exploitation of distant markets (given that network programming is theoretically available across the country) and because cable retransmission *within* the "local service area" was not felt by Congress to threaten the existing local market for copyright owners, Congress confined the Tribunal's awards to *nonnetwork* programs retransmitted *beyond* the primary transmitter's local service area. *See NAB v. CRT,* 675 F.2d at 373 & n. 3 (noting that "local service areas" are defined by the FCC and generally encompass a 100-mile radius). Other than this restriction, however, Congress felt that "it would not be appropriate to specify particular, limiting standards for distribution" of cable royalties, and left the development of distribution criteria to the Tribunal on the basis of "all pertinent data and considerations presented by the claimants." *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 97 (1976), U.S.Code Cong. & Admin.News 1976, pp. 5659, 5712 (hereinafter cited as House Report).

In its 1979 proceeding, the Tribunal was presented with a welter of conflicting data based on such diverse factors as "television viewing, cable royalty fee generation, attitudinal surveys of cable operators, advertising rates, broadcast station expenditures, economic regression analyses, distant signal programming time, innovative and quality programming, and technical equipment." 47 Fed.Reg. 9,892 (1982). After finding that no single formula or rationale provided an adequate basis for allocation, the Tribunal adopted the same five distribution criteria that it had developed in its 1978 proceeding:

The Tribunal determined the primary factors to be:

(a) the harm caused to copyright owners by secondary transmissions of copyrighted works by cable systems,

(b) the benefit derived by cable systems from the secondary transmission of certain copyrighted works, and

(c) the marketplace value of the works transmitted.

The Tribunal determined the secondary factors to be:

(a) quality of copyrighted program material, and

(b) time-related considerations.

*Id.; see* 45 Fed.Reg. 63,035 (1980) (announcing five criteria in 1978 proceeding). In applying these criteria to the 1979 record, however, the Tribunal noted that the "harm" test proved of limited utility because there was little concrete evidence by which to determine that cable retransmission had harmed one group more than any other. *See* 47 Fed.Reg. 9,892, 9,899 n. 477 (1982) (parties unable to provide more than "theories" or "anecdotal" evidence of harm). Accordingly, the 1979 Decision focused on those factors that the Tribunal found to appraise more accurately the compensable marketplace value, lost due to cable retransmission, of a claimant's ability to

exploit his or her works. In this appraisal, the Tribunal put particular emphasis on two types of evidence. First, the Tribunal found that MPAA's Nielson Report—analyzing the public's viewership of different categories of programming—was the "single most important piece of evidence" in the record, having "probative value in establishing the entitlement of claimants in accordance with some, but not all, of the criteria." *Id.* at 9,892. Second, the Tribunal found that the presentation of the Joint Sports Claimants—emphasizing evidence that cable operators consider sports programming as increasingly important to their ability to attract and retain subscribers—was "structured and presented to focus on the marketplace considerations we have found most persuasive and useful." *Id.* Because the Nielsen Report and JSC's attitudinal evidence indicated that movies and sports programs contribute overwhelmingly to cable's attractiveness, it is hardly surprising that over 80% of the 1979 distribution was allocated to MPAA and JSC.

## II. THE SCOPE OF REVIEW

■ The Tribunal's distribution determinations are subject to the judicial review provisions of the Administrative Procedure Act (APA). *See* 17 U.S.C. § 810 (Supp. V 1981); House Report at 179 ("The amended bill provides for the full scope of judicial review provided by Chapter 7 of the [APA]"). As we indicated in *NAB v. CRT,* the Tribunal's allocations must be neither arbitrary nor capricious and must be supported by substantial evidence. 675 F.2d at 374–75 & n. 8. In acknowledging the need for substantial evidence, however, we emphasize that the Tribunal's choice of a particular percentage allocation is not reviewable for exact precision, but simply for rationality; we are without power to set aside a particular percentage allocation provided that it is within a "zone of reasonableness." *Id.* at 374 (quoting *Permian Basin Area Rate Cases,* 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968)); *accord Montana-Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951) ("To

reduce the abstract concept of reasonableness to concrete expression in dollars and cents is the function of the Commission").

■ We also recognize that, in evaluating the adequacy of the Tribunal's articulation of its bases for decision, we must not confuse form with substance. Our task is not to insist that the Tribunal express itself as elegantly as possible. *Cf. National Cable Television Association v. Copyright Royalty Tribunal,* 689 F.2d 1077, 1087 n. 74 (D.C.Cir. 1982) (excusing Tribunal's lack of clarity in light of its almost complete lack of staff). Rather, we review the adequacy of the Tribunal's explanations to ensure that the agency has genuinely engaged in reasoned decisionmaking. Accordingly, as we stated in *NAB v. CRT,* the Tribunal's findings will be upheld, though of less than ideal clarity, if the path which the agency follows can reasonably be discerned. *See* 675 F.2d at 376 n. 10; *accord Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595, 65 S.Ct. 829, 836, 89 L.Ed. 1206 (1945); *Recreation Vehicle Industry Ass'n v. EPA,* 653 F.2d 562, 572 n. 78 (D.C.Cir.1981); *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 851 (D.C. Cir.1970), *cert. denied,* 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

■ To these well-established standards of judicial review, we add a caveat regarding challenges to the Tribunal's failure to award several claimants any shares of the Fund at all. To the extent that the Tribunal's non-awards are based on the record evidence (or lack thereof), it is appropriate to review the Tribunal's decision with particular care. Although we have held squarely that the Act does not compel awards to all claimants, *NAB v. CRT,* 675 F.2d at 380, the Tribunal itself has recognized that the Act presumes copyright owners to suffer some detriment arising from the retransmission of their works by cable into distant markets, *see* 47 Fed.Reg. 9,892 (1982); 45 Fed.Reg. 63,035 (1980). *See generally* House Report at 90 (congressional assumption that cable retransmission impairs copyright owner's ability to exploit distant markets). We do not quarrel with

the Tribunal's finding that there is little concrete evidence in the 1979 proceeding to prove the relative degrees of detriment among groups of claimants, thereby reducing the utility of the "harm" test as an allocational device. But we will scrutinize carefully, within the limited scope of our review under the APA, the Tribunal's determination that a claimant's retransmitted works are of such negligible marketplace value and/or of such negligible benefit to cable operators that no award at all is reasonable.

## III. INDIVIDUAL CLAIMS

### A. No. 82–1372, MPAA v. Tribunal

MPAA, on behalf of numerous producers and syndicators, claims that program suppliers as a group are entitled to more than their 70% Phase I award and that MPAA, in particular, should receive more than its 96.8% Phase II share. The thrust of MPAA's case is that the Tribunal failed to explain adequately, or to adduce substantial evidence for, its awards to program suppliers and MPAA vis-à-vis other claimants. Specifically, MPAA attacks the Tribunal's Phase I allocations to JSC and NAB and its Phase II allocations to Multimedia, NAB, and SIN. In light of the whole record of the 1979 proceeding, however, we affirm the Tribunal's distributions.

■ In general, we have little difficulty in discerning the "path" followed by the Tribunal in its various Phase I awards. The Tribunal's allocation to program suppliers largely reflected the "hard numbers" in MPAA's Nielsen Report, on which program suppliers had based a claim to 80.5% of the Fund, as adjusted downward to 70% for (1) the possibility of certain methodological weaknesses in the Report, and (2) independent evidence from JSC and NAB that their programming was of relatively greater benefit to cable operators in attracting subscribers than was MPAA's. See 47 Fed. Reg. 9,892–94 (1982). The Tribunal adequately explained, and supported, its reasons for following this approach.

A major reason for the Tribunal being unable to accord the Nielsen "hard numbers" the weight urged upon us by MPAA is that we share the views advanced by certain other claimants, notably Joint Sports and NAB, that cable operators are interested in selling subscriptions and that viewership [which the Nielsen Report measures] is of limited relevance to cable operators.

In assessing the weight to be accorded the Nielsen Report we have also considered the evidence as to the methodology of the study, the selection of the station sample on a fee generated basis previously found deficient by the Tribunal, the use of "sweep periods," and the role of MPAA in the design and execution of the survey.

Id. at 9,892; see id. at 9,882–83, 9,885 (pertaining to attitudinal surveys of cable operators); Sports Exhibits 19–24, CRT Docket 80–4 (pertaining to methodology and design of Nielsen Report).

MPAA objects to the wording of several passages in the Tribunal's Decision. Our search for a discernible path of reasoned decisionmaking, however, should not be confused with hypertechnical scrutiny of an agency's phraseology. In light of the purpose for which we review an agency's explanations, and the different evidentiary records in the Tribunal's 1978 and 1979 proceedings, we find the Tribunal's rationale for its 1979 allocation to program suppliers to be at least as indicative of reasoned decisionmaking as was its rationale (defended vigorously by MPAA last year) for the program suppliers' 1978 allocation.

■ In affirming the Tribunal's 1979 allocation, we reject MPAA's argument that the Tribunal's general approach was undermined by the program suppliers' evidence of "harm." The Tribunal explained, by explicit reference to the proposed evidentiary findings of two other claimants, that "there is little concrete evidence of record with regard to the Congressional presumption of harm, although a number of parties have tendered evidence and arguments concerning theories and 'anecdotal' instances of

what they believe to be harm...." 47 Fed.Reg. 9,899 n. 477 (1982) (incorporating proposed findings of JSC and Public Broadcasting). It is well established that an agency may explain itself by incorporating by reference parts of the record, see *NAB v. CRT*, 675 F.2d at 376 n. 10, and, in this instance, the Tribunal's desire to downplay comparisons based on relatively imprecise, "anecdotal" evidence adequately explains why it chose not to magnify much of the program suppliers' evidence of harm. *See, e.g.,* JA 1,565 (testimony of Mr. Valenti, President of MPAA) ("From a qualitative viewpoint, just a couple of quotes. I scribbled down—see the scribbles—a couple of quotes from our salesman"); JA 1,243 (testimony of Mr. Horn, President of Tandem/T.A.T.) (referring to personal conversation with salesman comparing sales to television serials in heavily- and lightly-cabled markets).

Nor are we persuaded by MPAA's charge that the Tribunal inadequately explained and justified its specific Phase I awards to JSC and NAB. JSC presented evidence that cable operators perceive sports programming to account significantly for the ability of cable systems to attract and retain subscribers; in part, this evidence was adduced through the direct testimony of several cable operators and, in part, through an industry-wide survey similar to one which JSC had introduced in the 1978 proceeding (the BBDO survey). Although the Tribunal acknowledged that this "attitudenal [sic] evidence cannot be the sole basis of ... allocation," it noted that adjustments had been made in the 1979 BBDO survey to correct certain methodological deficiencies, and concluded that "the trends reflected in the 1978 and 1979 BBDO studies ... [lend] support for a finding that cable operators assign a declining value to distant signal carriage of movies with a corresponding rise in the value of sports." 47 Fed.Reg. 9,882, 9,893 (1982). MPAA argues that the Tribunal's reasons for relying on this attitudinal evidence—in lieu of the "direct" evidence of viewership measured in MPAA's Nielsen Report—is nowhere explained. We disagree. The Tribunal expressly stated that, "[a]s in the 1978 royalty proceeding, the direct case of the Joint Sports claimants was structured and presented to focus on the marketplace considerations we have found most useful." *Id.* at 9,892. Given that JSC's 1978 presentation was designed to reflect "how the cable industry would have allocated its royalty dollars if it had been required to bargain about compulsory licensing," 45 Fed. Reg. 63,029 (1980), we find the Tribunal's reiteration of these marketplace considerations in its 1979 Decision to be adequately explained. Indeed, given Congress' evident intent to have the Tribunal operate as a substitute for direct negotiations (which were thought to be impractical) among cable operators and copyright owners, *see* House Report at 89, we find the Tribunal's receptiveness to evidence simulating the commercial attitudes of the "buyers" in this supplanted marketplace to be more than reasonable.

Although we also affirm the reasonableness of the Tribunal's Phase I allocation to NAB, we are not as sanguine about the quality of the Tribunal's explanation. NAB's award was intended to compensate television broadcasters for the retransmission by cable of certain "local" broadcasts, such as station news and public affairs programming, to relatively nearby (though technically "distant") communities. In support of its Phase I claim, NAB presented testimony from cable operators and a survey of cable subscribers indicating the benefit of local broadcasts to cable systems; evidence concerning the relatively high percentage of commercial "distant" signals originating less than 150 miles from the cable community; and, in particular, a study of the amount of time allocated to local broadcasts retransmitted by cable. *See* 47 Fed.Reg. 9,883–84 (1982). In contrast to NAB's presentation in the 1978 proceeding—which provided no evidence of local broadcasting's benefit to cable; was supported almost entirely by a mechanistic time-based formula; and was characterized by the Tribunal as having left the record in "a state of utter confusion and disarry [sic]"

—NAB's 1979 presentation was praised by the Tribunal for having been made "in an effective and coherent manner." *Compare* 45 Fed.Reg. 63,038 (1980) (discussing 1978 presentation) *with* 47 Fed.Reg. 9,893 (1982) (discussing 1979 presentation). Despite this compliment, however, the Tribunal adopted by reference the views of several claimants that NAB's 1979 presentation had merely repeated NAB's time-based 1978 case, and furthermore stated that its review of the 1979 record had not caused it "to alter the basic conclusion we reached in the earlier [1978] proceeding." 47 Fed.Reg. 9,893 (1982). Although the Tribunal next acknowledged specifically the new evidence introduced by NAB for 1979, it stated that a review of the 1979 record left it unpersuaded that local broadcasting was "of more than marginal value to cable operators, or a significant factor in the decision of the public to subscribe to a cable system." *Id.* Finally, the Tribunal concluded that NAB's 1979 award should reflect a "downward adjustment of the 'hard numbers,' whether viewed from either the NAB perspective of total programming hours [the time-based evidence] . . . or the time and viewing data of the program syndicators [the Nielsen Report]," but then, paradoxically, announced that NAB would receive for U.S. broadcasters a 1.25% *increase* over its 1978 Phase I award of 3.25% (which had even included an award for Canadian broadcasters).

Faced with such a tortured explanation of NAB's award, we appreciate the vigor of MPAA's request to vacate and remand this aspect of the Tribunal's Decision. Nevertheless, even the inartful author of this section of the Decision has not been able to camouflage completely the discernible and defensible path of the Tribunal's allocation. In context, we take the Tribunal's criticism of NAB's time-based evidence, and the Tribunal's conclusion that local broadcasting is of only "marginal" value, to explain why NAB's original claim to 12.7% to 17.2% of the entire Fund was significantly overblown. Similarly, we understand these deficiencies in NAB's case to justify a downward adjustment in the 19%

time and 8% viewing percentages, attributed to local broadcasting, in the Nielsen Report. *See* 47 Fed.Reg. 9,881 (1982) (Nielsen breakdown for local broadcasting). But, given that the Tribunal has identified these Nielsen percentages as "the single most important piece[s] of evidence in the record" and "a useful 'starting point' for the application of the criteria to the record evidence," *id.* at 9,892, the Tribunal was compelled to recognize that the "marginal" value of local broadcasting to cable systems was not quantitatively *de minimis*. Although our review of an agency's explanation does not permit us to "guess" at its thinking, *Greater Boston Television Corporation,* 444 F.2d at 851, we conclude that the Tribunal's award of 4.5% to NAB was adequately explained to be within the "zone of reasonableness" bounded by the Nielsen "hard numbers," on the one hand, and the Tribunal's appraisal of NAB's case-in-chief, on the other. In affirming the Tribunal's allocation, however, we take this opportunity to paraphrase an admonition previously given by this court to the Tribunal:

> While we do not sanction [the quality of the Tribunal's explanation], we have regarded [it] charitably in light of the Tribunal's lack of a professional staff and the [relative] novelty of the proceeding. We expect the quality of the Tribunal's decisionmaking to improve with experience.

*National Cable Television Association v. Copyright Royalty Tribunal,* 689 F.2d 1077, 1091 (D.C.Cir.1982) (Bazelon, J.). The time for improvement is now.

Finally, we consider MPAA's challenge to the Tribunal's Phase II allocation among program suppliers. Although we evaluate below additional challenges to the Phase II proceeding by the Devotional Claimants and SIN, we address here MPAA's claim that its 96.8% Phase II share is unjustifiably small in light of the Tribunal's awards, alleged to have been made without sufficient evidentiary support, to Multimedia Program Productions, Inc. (1.6%), NAB (0.8%), and SIN (0.7%). We reject MPAA's claim.

■ In Phase II, MPAA represented a group of fifty-eight program suppliers which had voluntarily agreed to divide among themselves 98.5% of the program suppliers' Phase I allocation. MPAA asserts that the Tribunal's award to MPAA of only 96.8% necessarily represents a penalty, imposed on the fifty-eight cooperating suppliers for having reached an agreement. This assertion is groundless. Not only did the Tribunal indicate that it "welcomes voluntary agreements," 47 Fed.Reg. 9,895 (1982), but it indicated generally why the aggregate, Phase I-type evidence relied upon by MPAA in Phase II was marginally less probative of the Tribunal's five allocational criteria than was the more individually-tailored evidence of Multimedia, NAB, and SIN, *see id.* Although the Tribunal certainly could have been more specific in its evaluation of MPAA's aggregate evidence, as well as more specific in its identification of the evidence on which it based its competing awards to Multimedia, NAB, and SIN, we cannot say that, considering the record as a whole, the Tribunal's allocations were outside an identifiable zone of reasonableness. Specifically, we note that Multimedia's 1.6% award can be justified by evidence in the record indicating the value to cable of its *Donahue Show* and *Young People's Specials, see id.* at 9,888, as discounted by *Donahue's* wide availability on local television stations, *see id.* at 9,895. NAB's award (as a syndicator of station programming) of 0.8% can be justified by what the Tribunal characterized as a "minimal" evidentiary showing that station-syndicated programming is of value to cable because it is generally not as widely distributed as other syndicated programs and because of its "intrinsic value, timeliness, and freshness." *See id.* at 9,896. And SIN's award of 0.7% can be justified, despite the acknowledged insufficiencies in SIN's case-in-chief (discussed *infra*), by evidence that cable operators' payments for SIN's programming often reflect the fact that SIN represents the exclusive Spanish-language signal within certain primary areas. *See id.* at 9,889.

For the reasons discussed above, MPAA's petition for review of the Tribunal's Phase I and Phase II allocations is denied.

B. *Nos. 82–1213, 82–1326, 82–1327, Devotional Claimants v. Tribunal*

The Christian Broadcasting Network (CBN), Old-Time Gospel Hour (OTGH), and PTL Television Network (PTL) are the copyright owners of television programs with varying degrees of religious themes. CBN, for example, is the producer and syndicator of twenty-two programs, the most widely known of which is *The 700 Club;* a daily program that typically consists of "55½ minutes of public affairs material, 8 minutes of entertainment, and 7½ minutes of religion." CBN Brief at 25. PTL produces and distributes two live, daily "talk-music-entertainment" programs, the *PTL Club* and the Spanish language *Club PTL.* PTL Brief at xii. OTGH produces and distributes a weekly, one-hour Sunday Service, *The Old-Time Gospel Hour,* conducted by Reverend Jerry Falwell. Despite the differences among their programs, CBN, PTL, and OTGH share several common organizational and financial attributes. Each of these organizations, for example, distributes its programs to broadcasting stations with the understanding that no commercial interruptions are to be allowed. Perhaps for this reason, each of these organizations pays broadcasters to air the programs—reversing the usual arrangement in which the *broadcaster* pays the producer/syndicator for a program and then capitalizes on the program through the sale of advertising time. Another common attribute is that CBN, PTL, and OTGH all use their programs as vehicles for soliciting donations; indeed, each of these organizations finances its production and distribution costs entirely from viewer contributions.

In addition to the distribution of their programs through broadcasting stations, CBN and PTL also distribute their programs over their own twenty-four-hour satellite programming services. These services relay a variety of programs, including some CBN- and PTL-produced programs, directly

to cable stations for retransmission (over the cables) to subscribers. Although, in operating their satellite networks, CBN and PTL relay their own programs without commercial interruption, they do attempt to sell advertising time for the other programs. In addition to distribution by satellite, CBN distributes its programs through four commercial broadcast stations (in Atlanta, Boston, Dallas, and Portsmouth (Va.)) owned by CBN Continental Broadcasting, Inc., a CBN subsidiary.

CBN, PTL, and OTGH each presented separate cases before the Tribunal. Perhaps because of the similarities among these three program suppliers, however, the Tribunal treated them as a group, the "Devotional Claimants," to which it made no award in the Phase II distribution among producers and syndicators. Although, on appeal, these claimants continue to argue independently, we shall evaluate first their overlapping objections to the Tribunal's "group" decision before discussing, briefly, several more particular objections raised individually in the briefs. Because we are not satisfied that the Tribunal's treatment of the Devotional Claimants reflects reasoned decisionmaking, we remand this aspect of the Phase II distribution for redetermination.

### 1. *The Tribunal's "0" Award*

The Tribunal gave two reasons for denying the Devotional Claimants an award. First, it found that devotional programming had no marketplace value (one of the three primary criteria) because its producers had to pay broadcasters to air it. In the Tribunal's words:

> We regard it as a *fundamental distinction* the practice of these syndicator claimants to buy time on television stations to broadcast their programs, while other syndicated programs are purchased by the stations.

47 Fed.Reg. 9,896 (1982) (emphasis added). Second, and subordinately, the Tribunal found that the Devotional Claimants are not "harmed" by cable retransmission of their programming (another of the Tribu-

nal's original criteria), and indeed may benefit from it because the expanded viewing audience could provide a source of additional donations:

> Although, as discussed elsewhere, we have not found the evidence on the harm criteria to provide much assistance in allocating royalty shares, cable carriage may well benefit these claimants because the expanded carriage provides greater exposure and the potential of increased contributions from viewers. The record establishes that these claimants rely upon direct contribution for the support of the programs and other activities.

*Id.* Although the Tribunal's explanations appear at first blush to be perfectly reasonable, they take on an air of unexplained arbitrariness when measured against the evidentiary record of the 1979 proceeding and the Tribunal's dissimilar treatment of claimants which, in several respects, seem similarly situated to the Devotionals.

We begin by reiterating that there is nothing necessarily irrational about the Tribunal's "fundamental distinction;" the fact that CBN, PTL, and OTGH pay broadcasters to air devotional programming provides, as a matter of logic, the basis for a reasonable inference that their programming is without recognizable market value. But while we do not criticize the Tribunal's abstract logic, the Tribunal completely fails to acknowledge (much less discuss) record evidence suggesting factual weaknesses in its neat conclusion. For example, nowhere does the Tribunal discuss the contention—repeatedly pressed by the Devotional Claimants—that their payments to broadcasters reflect a conscious, self-inflicted cost of commercial-free formatting rather than any external indication of market worthlessness. *See, e.g.,* Tribunal Summary of PTL's Evidentiary Position, 47 Fed.Reg. 9,890–91 (1982) ("Religious programmers choose not to mix advertising with their programming in order to retain freedom of expression"); CBN Exhibit 1, JA 450–51 ("Interspersing such programs with product commercials would be as offensive and out of place as billboards in a church or syna-

gogue"). Nor does the Tribunal acknowledge the merits of a counterargument, also pressed repeatedly by the Devotional Claimants, that the market value of their programming is reflected in the "value viewers place on it in that they are willing to pay to support it [through donations]." Tribunal Summary of CBN Evidentiary Position, 47 Fed.Reg. 9,890 (1982); *cf.* Tribunal Summary of PTL Evidentiary Position, *id.*, at 9,891 (making same point to proffer evidence of "quality"). These failures, by themselves, may not necessarily vitiate the Tribunal's "fundamental distinction"—"[s]ubstantial evidence is not lacking merely because the agency chooses one conclusion from evidence that arguably supports 'two inconsistent conclusions.'" *NAB v. CRT,* 675 F.2d at 367 (quoting *Consolo v. FMC,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966)). But the Tribunal's conspicuous failure to discuss these relevant aspects of the Devotional Claimants' case makes it difficult for us to appraise the reasonableness of the Tribunal's response to the record evidence.

Moreover, troubling indications of arbitrariness arise when, in considering the cases of Public Broadcasting Service (PBS) and National Public Radio (NPR), the Tribunal felt free to make awards to claimants *regardless* of "commercial marketplace factors." 47 Fed.Reg. 9,893 (1982) (making 5.25% Phase I award to PBS); *id.* at 9,894 ("As with our review of the PBS claim, some customary guides to judging the marketplace value of program product are not useful. The record supports a finding that the programming has a special appeal, which justifies an award") (making .25% Phase I award to NPR). And even more specific indications of arbitrariness are suggested by the Tribunal's Phase II recognition (albeit only on the order of a .1% award) to Mutual of Omaha for *Wild Kingdom*—despite the Tribunal's acknowledgment that Mutual of Omaha "barters" its program to broadcasters (i.e., receives no money for it), uses the program as an "advertising vehicle," and "receives some benefit" from cable retransmission. *Id.* at 9890, 9896. Measured in light of these awards,

the Tribunal's "fundamental distinction" begins to take on the texture of quicksilver.

Tell-tale indicators of capriciousness become more apparent when we turn, as the Tribunal did not, to the "benefit to cable systems" criterion: the criterion which, in discussing the Joint Sports Claimants' presentation, the Tribunal included as among "the marketplace considerations we have found most persuasive and useful." 47 Fed. Reg. 9,892 (1982). In its analysis of the Devotional Claimants' presentations, however, the Tribunal felt it unnecessary to discuss what appears to be at least noteworthy record evidence of "benefit to cable operators." *See, e.g.,* Letter from Ronald Roe, Hampton Roads Cablevision, to Pat Robertson, CBN (Jan. 6, 1982) ("your program [*700 Club*] has attracted a very loyal and dedicated audience that appears to be gradually increasing all the time"); Testimony of Walter Richardson, Vice President of Affiliate Marketing, PTL, Transcript (Tr.) 6922, JA 1674 (31 "cable affiliates" specifically subscribe to PTL satellite service); Testimony of Stanley Ditchfield, former CBN Executive, JA 459 (identifying apparently extensive cable retransmission of CBN-owned station KXTX–TV, which devoted 18.5% of its operating time to CBN programming); *id.,* at 458 (indicating notable percentage of stations qualifying as FCC "specialty" stations that carried CBN programming); Testimony of former FCC cable TV attorney and present MPAA attorney, Tr. 9844, JA 2171 ("Q: There is a benefit [to cable systems from carrying a specialty station] or they wouldn't carry it, is that correct? A: Of course"). While we do not necessarily interpret this evidence to require an award to the Devotional Claimants, the evidence does seem similar to that upon which the Tribunal appears to have elsewhere based awards. *See, e.g.,* 47 Fed. Reg. 9,893 (1982) (crediting testimony of individuals in cable industry regarding JSC's claim to benefit); *id.* (identifying cultivation by PBS of "target" audience to be of benefit to cable); *see generally* Decision at 9,896 (awarding SIN 0.7% despite "serious evidentiary deficiencies"); *id.* at 9,900

(justifying 0.25% award to NPR based on "slight" benefit from carriage by cable). In the absence of any discussion of this apparently relevant evidence, the Tribunal's non-award to the Devotional Claimants suggests an element of arbitrariness in the Tribunal's decisionmaking.

Finally, we come to the Tribunal's "harm" criterion and, specifically, to the Tribunal's conclusions that Devotional Claimants (1) may well "benefit" (a negative harm) from cable retransmission; (2) cannot claim harm for any interest involving their satellite services; and (3) are not harmed due to fractionalization of their local audiences. Although we do not find implausible the Tribunal's supposition that cable retransmission "may well benefit" the Devotional Claimants' contribution base, we are troubled by the unexplained vengeance with which the Tribunal seems to have applied this factor to CBN, PTL, and OTGH. At the outset, we note that the Tribunal did not determine the actual extent to which these claimants might be benefitted; accordingly, the Tribunal's notable reliance on this plausible—yet unquantified—presumption of benefit seems to run counter to the very reason given by the Tribunal for discounting use of the "harm" criterion in general. *See* 47 Fed.Reg. 9,896 & n. 477 (1982) (downplaying harm criterion in 1979 Decision because "none of the parties have been able to provide proof of harm with that degree of precision that an administrative agency might desire"). Indeed, the Devotional Claimants introduced evidence into the record (not discussed by the Tribunal) to suggest that the net benefit from cable to their fundraising efforts may be relatively moderate. *See, e.g.,* Tribunal Summary of PTL Evidentiary Position, 47 Fed.Reg. 9,891 (1982) (stations which know their signals are being retransmitted by cable charge PTL higher broadcasting rates); Tribunal Summary of CBN Evidentiary Position, *id.* at 9,890 (overexposure by cable importation damages local donors' willingness to contribute because they feel CBN is wasting money on duplicative programming). Even more troublesome, however, is the unevenness with which the Tri-

bunal's presumption of benefit seems to have been applied. For example, the Tribunal made Phase I awards to PBS and NPR without any discussion of these claimants' on-the-air fundraising, and made a Phase II award to Mutual of Omaha after affirmatively noting that Mutual of Omaha received "some [advertising] benefit from distant carriage." *Id.* at 9,896. The reasons why the "benefit from cable" factor completely forecloses the Devotional Claimants from *any* award are never presented. Given that "the single most important piece of evidence in the record," MPAA's Nielsen Report, recorded a small (but measurable) 1% viewing rating for devotional series, *id.,* at 9,881, we think that a more adequate explanation for a complete non-award was necessary.

■ Before discussing the Devotional Claimants' "satellite" and "fractionalization" arguments, it is necessary to identify briefly why the Devotional Claimants may be, at least on a conceptual level, less "fundamentally" distinct than the Tribunal seems to have supposed. We start from the observation that these claimants, like others, are copyright holders who attempt to exploit the economic value of their works. To be sure, their marketing strategies (and long-range aspirations) differ from those of most other claimants: rather than sell their programs to broadcasters for the programs' advertising values, the Devotional Claimants buy television time and use the value of their programs to solicit contributions from viewers. It may well be that, as a factual matter, cable retransmission will affect these two marketing systems differently; and we do not discount the possibility that the economic benefit of cable to the Devotional Claimants' system may outweigh its economic harms. But in making this determination, it is certainly the Tribunal's obligation to consider all legally-cognizable evidence of economic harm placed before it by the parties.

■ This observation becomes important in evaluating the Tribunal's treatment of CBN's and PTL's argument that

cable harms their satellite programming services. Specifically, these Devotional Claimants maintained that the availability of their programs on cable made it difficult (1) for CBN and PTL to place their satellite networks with other, competing cable systems (which may have felt, for instance, that their area already had "enough PTL"), and consequently (2) made it that much less likely for their programs to be shown during prime time, when viewership and potential contributions are at their maximum (CBN and PTL can almost never afford to buy prime time for their programs from commercial broadcasters, but both claimants schedule their own programs during prime time on their satellite networks). To both of these arguments, the Tribunal responded:

> Whatever the situation may be, we hold that any harm suffered by a satellite network, whether or not the harm can be linked to distant signal importation, is not a harm for which the Tribunal can provide compensation under the provisions of Section 111 of the Copyright Act.

47 Fed.Reg. 9,896 (1982). We think that the Tribunal's interpretation of the Act was partly, but not entirely, correct. To the extent that the Tribunal refused to recognize general revenue loss from these claimants' inabilities to "place" their satellite networks—beyond the specific, marginal loss of prime time contributions from their copyrighted programs—we agree. As CBN itself admits, "The distribution process focuses on harm to copyright owners in their capacity as copyright owners, not on injury to broadcasters ... who may incidentally be copyright owners ...." CBN Reply Brief at 29. By the same reasoning, the Act does not envision royalty fee distribution to satellite network owners for harm to their networks, simply because these owners may incidentally hold valid copyrights to some of their networks' programming. But to the extent that the Devotional Claimants can prove (to the Tribunal's satisfaction) that cable retransmission has measurably diminished their ability to exploit the contribution potential of their particular works, whether by satellite or other-

wise, we see no reason why such an opportunity loss would fall outside the scope of section 111 of the Act. *See* House Report at 90 (emphasizing desire to compensate copyright holders for cable's adverse effects on owner's ability to exploit work in distant markets). Although it appears to us that proving such an attenuated loss would be extremely difficult, competent evidence of such a harm would not be beyond the power of the Tribunal to evaluate.

■ Similarly, we find the Tribunal authorized to consider evidence of economic harm due to fractionalization—the splitting of a program's local audience because of distant signal importation of other programs. In response to an argument by OTGH that fractionalization of its audience by cable importation forces it to pay more for station time (allegedly because the station loses some of the "lead time" value of OTGH to the next program), the Tribunal responded:

> We have also not found convincing the theory advanced by OTGH that we should distribute royalty fees to compensate it for alleged harm resulting from fractionalization of its audience because of distant signal importation of other programs.

47 Fed.Reg. 9,896 (1982). To the extent the Tribunal's decision reflects an evaluation of OTGH's evidence of loss, it stretches our tolerance of even those "vague" or "summary" findings sanctioned in *NAB v. CRT,* 675 F.2d at 376 n. 10. To the extent the Tribunal's decision reflects its rejection of OTGH's entire "theory" of harm, we find it difficult to reconcile with the Tribunal's original explanation of "harm" announced in its 1978 determination: "It is also our opinion, as reflected in the record, that there is a further adverse economic impact on a copyright owner from the importation of competing distant works into the aggrieved party's local community." 45 Fed. Reg. 63,035 (1980). Our inability to tell which of these two possibilities the Tribunal meant to express only highlights the reason we are forced to remand this aspect of the Decision back to the agency.

## 2. Miscellaneous Challenges

We do not base our remand on any of the other various legal and procedural challenges advanced by the Devotional Claimants on appeal. First, we reject the contention that all bona fide copyright owners whose works were retransmitted by cable are entitled to an award as a matter of law. As we stated in our decision in *NAB v. CRT*, the Act envisions the need for copyright holders to qualify for distribution of the Fund. 675 F.2d at 380. In light of Congress' evident intent to leave the development of "particular, limiting standards for distribution" to the Tribunal, House Report at 97, we have affirmed the Tribunal's five allocational factors as a reasonable interpretation of legislation by the agency charged by Congress with its enforcement. *NAB v. CRT*, 675 F.2d at 380; *see generally FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981). It is for the Tribunal, and not each claimant, to determine in the final analysis whether (and to what extent) a particular claim satisfies these allocational criteria.

Nor do we find that the Tribunal was "locked into" making an award to the Devotional Claimants in Phase II, after having initially granted a 70% Phase I distribution to the "Motion Picture Association of America and other program syndicators *including claimants for syndicated religious programs* . . . ." 46 Fed.Reg. 58,545 (1981) (emphasis added). Although we remanded such a change of course (concerning an award to NPR) in *NAB v. CRT*, we emphasized in that decision that our remand was based entirely on the fact that the Tribunal's rescission of NPR's Phase I allocation occurred in procedurally infirm proceedings that violated the Tribunal's own public meeting requirements. *See* 675 F.2d at 384–85. No such procedural irregularity occurred in the Tribunal's 1979 Decision. Although, as we have emphasized, the Tribunal's explanation for its non-award to the Devotional Claimants in Phase II was inadequate, the Tribunal was not legally foreclosed from reevaluating the Phase I record

for Phase II purposes. *See* 47 Fed.Reg. 9,895 (highlighting differences between Phase I and Phase II proceedings). If on remand, however, the Tribunal continues to maintain its current Phase II non-award, it must adequately explain "why it [chose] to reject the reasoning of its initial decision," *National Association of Food Chains, Inc. v. ICC*, 535 F.2d 1308, 1318 (D.C.Cir.1976), especially in light of the Tribunal's Phase II award to MPAA based entirely on MPAA's Phase I evidence, *see* 47 Fed.Reg. 9,895.

The Devotional Claimants assert that other procedural irregularities occurred in the 1979 proceeding. In general, they maintain that the Tribunal failed to determine that its awards were made to proven copyright owners and, in particular, that the Tribunal allocated royalty fees to claimants which failed to satisfy the Tribunal's minimal filing requirements, *see* 37 C.F.R. § 302.3 (1982). Although these assertions correctly indicate that several "technical" filing imperfections surfaced fairly late in the 1979 proceeding, we do not interpret the Tribunal's decision as having overlooked these problems. Rather, the Tribunal stated that it had applied its rules (albeit "flexibly") in light of the record evidence; specifically, the Tribunal found that "evidence in this record establishes that programs of each of the claimants with defective claims were carried as distant signals," and further stated that it had not awarded cable fees to claimants "which did not submit adequate entitlement justification." 47 Fed.Reg. 9,895, 9,987 (1982). Although the Devotional Claimants suggest certain theoretical difficulties with the Tribunal's approach, *see, e.g.,* JA 1633–34 (suggesting that 20% of movies may "potentially" now be in the public domain), there is substantial evidence in the record to support the Tribunal's conclusion that its awards went only to bona fide copyright owners, *see, e.g.,* Record of Proceeding, Jan. 19, 1982, at 58–60 (supporting reasonableness of MPAA's assumption that, in the absence of any claims of fraud, syndicators or producers were copyright owners or represented rightful owners). Finally, we re-

ject OTGH's claim that the Tribunal's proceedings took longer than the one-year time period statutorily imposed by 17 U.S.C. § 804(e) (Supp. V 1981). The Tribunal rendered its final 1979 Determination on March 2, 1982—precisely one year after the effective date of its Federal Register notice announcing that proceedings had begun. *See supra,* pages 1300–1301. OTGH indicates that "[s]omebody at the Office of the Federal Register was more efficient than the Tribunal expected" and the notice (with a stated effective date of March 2, 1981) was actually published on February 26, 1981. OTGH Brief at 13–14. But we decline to hold that Congress' one-year period of decisionmaking was violated by the efficiency of the Office of the Federal Register; it is to the specified "effective date" of the Tribunal's 1981 Notice that we give legal significance. *Cf. Interstate Natural Gas Association of America v. FERC,* 716 F.2d 1 at 9 (D.C.Cir.1983) (Natural Gas Policy Act became law on November 9, 1978 but with an "effective date" of December 1, 1978).

For the reasons discussed above, the petitions of CBN, PTL, and OTGH are granted in part and denied in part, and the Tribunal's Decision remanded for further proceedings consistent with this opinion.

## C. *No. 82–1383, SIN v. Tribunal*

SIN challenges the Tribunal's rejection of a "fee-generated" formula for awarding distributions. By using such a formula, which links the distribution of royalty fees to the amount of fees paid into the Fund, SIN claims that it is entitled to a larger Phase II award for its Spanish language programming. SIN also challenges the Tribunal's Phase II award to MPAA, as did the Devotional Claimants, for having been made without proper regard to copyright ownership. Because neither of these arguments provides a defensible reason for upsetting the Tribunal's Decision, we affirm the Tribunal's allocation to SIN.

To begin, we reject SIN's contention that the Tribunal was obligated to issue a general rule on the validity *vel non* of fee-generated methodologies; the Tribu-

nal is under no obligation to proceed by general rulemaking. *See SEC v. Chenery Corp.,* 332 U.S. 194, 201–03, 67 S.Ct. 1575, 1579–81, 91 L.Ed.2d 1995 (1947); *Trans-Pacific Freight Conference v. Federal Maritime Commission,* 650 F.2d 1235, 1244 (D.C. Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981). It is sufficient that the Tribunal explained that it chose not to address the general validity of fee-generated formulas because "the record establishes that the formula presented by SIN contains such incomplete and unreliable data that it could not be utilized for distribution purposes, regardless of what conclusion we might reach as to its rationale." 47 Fed.Reg. 9,896 (1982). The Tribunal's position is supported by substantial evidence in the record. *See, e.g., id.* ("It has been established that SIN does not own approximately 40% of the program"); JA 9440 (SIN's definition of "primary market zone" was conceded to bear no relation to the definition established in FCC rules); JA 9358, 9431 (indicating that SIN's studies were judged by SIN to justify, at various times, such inconsistent distributions as $184,384; $210,000; and $311,000).

We also reject SIN's challenge to the Tribunal's award to MPAA. SIN raises virtually the same objections—regarding copyright ownership—as were raised by the Devotional Claimants. As we explained in our discussion of Nos. 82–1213, 82–1326, and 82–1327, however, such a challenge cannot withstand scrutiny. *See supra* pages 1312–1313. Moreover, as we explained in our discussion of No. 82–1372, *supra* pages 1303–1307, the reasonableness of the Tribunal's allocations to both MPAA and SIN are supported by substantial evidence. Accordingly, for the reasons stated in these earlier aspects of our decision, as well as for those reasons added above, we affirm the Tribunal's 0.7% Phase II allocation to SIN.

## D. *No. 82–1371, NAB v. Tribunal*

As a final matter, we consider two arguments advanced by NAB. First, on behalf of television broadcasters, NAB seeks reversal of the Tribunal's conclusion that no

Phase I award could legally be accorded television broadcasters for the value of their contribution to sports telecasts. Second, on behalf of commercial radio broadcasters, NAB challenges the Tribunal's failure to make any Phase I award for the distant carriage of radio signals by cable. We consider these arguments *seriatim*.

### 1. *NAB's Claims Regarding Sports Telecasts*

█ In the 1979 proceeding, NAB took the position that some of the funds distributed to the sports claimants should be allocated to television broadcasters for their copyrightable contributions to the quality of sports telecasts. To this end, NAB introduced evidence attempting to demonstrate the manner in which broadcasters' efforts—such as instant replay, split screens, play-by-play commentary, and video/audio editing—add to the enjoyability of a sports telecast. *See, e.g.,* Tr. 3216–31, JA 1466–81 (videotapes of the 1981 Rose Bowl football game and of a 1981 Dodgers-Cubs baseball game). Although the Tribunal allowed this evidence into the record, it subsequently granted a request by the Joint Sports Claimants for a declaratory ruling that the 1976 Copyright Act forbade the Tribunal from awarding any "sports" royalty fees to television broadcasters. Specifically, the Tribunal reiterated its view, expressed in its 1978 Distribution Determination, that

> there is a clear course of action by the Congress [in the 1976 Copyright Act] ... which compels the award of cable royalties for sports programming to the sports league, in the absence of contractual arrangements specifically providing that such royalties shall be distributed to broadcaster claimants.

45 Fed.Reg. 63,035 (1980) (1978 Determination); *see* 47 Fed.Reg. 9,893 (1982) (adopting rationale from 1978 Determination in Tribunal's 1979 Decision); CRT Order, Sept. 30, 1981 (granting JSC request for declaratory ruling).

This court's subsequent decision in *NAB v. CRT* squarely rejected the Tribunal's interpretation of the Act:

Although there is some confusion in the legislative history, Congress clearly seemed to contemplate Tribunal recognition of the copyrightable interests [of broadcasters in sports telecasts]:

> "When a football game is being covered by four television cameras, with a director guiding the activities of the four cameramen and choosing which of their electronic messages are sent out to the public and in what order there is little doubt that what the cameramen and the director are doing is what constitutes 'authorship.'"

675 F.2d at 378 (quoting House Report at 52, U.S.Code Cong. & Admin.News 1976, p. 5665). Given that the Tribunal's evaluation of NAB's claim thus rests on an incorrect legal premise, NAB urges us to remand its claim regarding sports broadcasting to the Tribunal. We agree that a remand is in order; as we stated in *NAB v. CRT,* "the Tribunal has no authority under the Act to ignore valid copyright claims." *Id.* at 379. Although it is true that the *NAB v. CRT* court found a remand unnecessary, that decision rested on NAB's failure to introduce evidence in the 1978 proceeding from which the Tribunal could conclude that NAB's interests were of more than a "quantitatively *de minimis*" value. *Id.* As NAB itself admits, "In the 1978 proceeding ... the record contained no evidence regarding the value of the relative copyright contributions of broadcasters and sports teams to telecasts of sports events." NAB Brief at 19. In contrast, however, NAB *did* introduce evidence in the 1979 proceeding which attempted to demonstrate the value of NAB's contributions to sports telecasts. While we recognize that this evidence addresses "quality," one of the Tribunal's secondary criteria, we note that the Tribunal has found compensable value in other programs (notably those of PBS and NPR) largely on the strength of this factor. However probative of marketplace value NAB's evidence may prove to be, it is not our role to second guess the Tribunal's distributions; the assessment of NAB's evidence belongs, in the first instance, to the Tribunal. We express no view on the dis-

tribution (if any) due broadcasters for their contributions to sports telecasts.

In remanding the case to the Tribunal, we also express no view on NAB's assertion that broadcasters are entitled to a specified percentage—either 36.5% or 18.25%—of the royalty fees allocated for sports programming. The bases for NAB's claim are two-fold: (1) that in 36.5% of the 1979 sports telecasts, U.S. television broadcasters created the programs and did not assign the copyrights in those programs to the sports teams; and (2) that television broadcasters are either the sole "authors" of these broadcasts (entitling them to 36.5% of the Tribunal's allocation for sports) or are one of the "joint authors" (entitling them to one-half of the royalty fees allocated to these telecasts, or 18.25%). Whatever the merits of this claim, NAB was not permitted to raise it before the Tribunal. Accordingly, the claim is not properly raised, in the first instance, on appeal. *See D.C. Transit System, Inc. v. Washington Area Transit Commission*, 466 F.2d 394, 413–14 (D.C.Cir.) (judicial review of administrative action limited to matters upon which the agency has had the opportunity to pass), *cert. denied*, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972). Because the Tribunal had previously (and erroneously) precluded NAB from raising "ownership" claims in the 1979 proceeding, *see* CRT Order, Sept. 30, 1981, however, we expect that NAB will be allowed to raise its authorship/joint authorship claim to the Tribunal on remand.

### 2. *NAB's Claim Regarding Commercial Radio Broadcasters*

Although cable systems generally are associated with the importation of distant *television* signals, many cable systems are equipped to import distant *radio* signals as well; the 1976 Copyright Act clearly authorizes the Tribunal to use the Fund to compensate "nonnetwork programming consisting exclusively of [distant] aural signals." 17 U.S.C. § 111(d)(4)(C) (Supp. V 1981). In its 1979 Decision, however, the Tribunal concluded that it had been "unable to discern any significant marketplace value or benefit from distant commercial radio carriage," 47 Fed.Reg. 9,894 (1982), and hence made no award to commercial radio broadcasters. On appeal, NAB contends that this non-award (1) is unsupported by substantial evidence, and (2) cannot be reconciled with the Tribunal's 0.25% Phase I award to NPR and with the Tribunal's Phase I award to the Music Claimants for the performance of copyrighted music on distant radio signals. While we find much of NAB's claim overstated, the apparent inconsistency of the Tribunal's treatment of Music and NAB forces us to remand the case to the Tribunal either for re-distribution or for an improved explanation of its non-award to NAB.

At the outset, we reject NAB's contention that its non-award is unsupported by substantial evidence. Although NAB introduced evidence which attempted to demonstrate the benefit of radio carriage to cable, *see, e.g.*, JA 1349 (cable systems typically charge separately for radio service), there is substantial evidence in the record to support the Tribunal's conclusion that commercial radio's value in the cable marketplace is sufficiently *de minimis* as not to warrant an award, *see, e.g.*, Testimony of Mr. Hall, Storer Cable Executive, Tr. 2567–71 (Storer Cable does not even attempt to ascertain the number of FM radio connections); Testimony of Mr. Abrams, Radio Programming Expert, Tr. 2708, JA 1389 (cable carriage of radio signals as of this point is not a significant factor in the radio broadcasting industry). The mere fact that the Tribunal relied on testimony (notably that of Mr. Frank Mankiewicz, then-President of NPR) which surmised that there might be "some" appeal to distant commercial radio signals, 47 Fed.Reg. 9,894 (1982), does not suffice to establish for NAB affirmative evidence, under the Tribunal's allocational criteria, mandating an award.

We also reject NAB's contention that the Tribunal's non-award to commercial radio is necessarily inconsistent with the 0.25% Phase I award to NPR. As the Tribunal explained, NPR

is a producer and syndicator of innovative, distinctive and quality radio programming that is transmitted by a number of cable systems as a distant signal. As with our review of the PBS claim, some customary guides to judging the marketplace value of program product are not useful. The record supports a finding that the programming has a special appeal, which justifies an award. 47 Fed.Reg. 9,894 (1982). There is substantial evidence for the Tribunal's conclusion that NPR's programming is of a distinctive quality, *see, e.g.,* Summary of NPR's Evidentiary Position, 47 Fed.Reg. 9,887 (1982) (NPR receives 100 times more awards than commercial radio), and for its conclusion that the quality of NPR's programming has special appeal to cable subscribers, *see, e.g.,* Affidavit of Janice Hill, NPR Deputy General Counsel, JA 64–66 (summarizing NPR's exhibits of letters of support to NPR from distant cable listeners). Given these documented differences in quality between commercial and public radio, we find the Tribunal's exceedingly small 0.25% award to NPR to be within a zone of reasonableness bounded, on the one hand, by the record evidence of NPR's quality and, on the other, by the record evidence of radio's generically *de minimis* value in the cable marketplace. The miniscule award to NPR is not necessarily inconsistent with the *de minimis* value of radio generally.

We have difficulty, however, in reconciling the Tribunal's award to the Music Claimants with its non-award to commercial radio broadcasters. Although the Tribunal did not specify how much of Music's 4.25% Phase I award was meant to reflect the use of copyrighted music on retransmitted radio, as opposed to television, signals, the Tribunal made clear that some of Music's award was intended to compensate copyright holders for the use of their music on radio:

> We find in the record in the cases of several parties sufficient evidence for use to include in our award to Music some compensation for the significant performance of copyrighted music on distant radio signals. The useful evidence on this issue is based on time, and even within that standard the record is not clear. . . . However, the total of copyrighted music is such as to warrant an award to Music.

47 Fed.Reg. 9,894 (1982). While, viewed in isolation, we find no fault with the Tribunal's reliance on Music's "time" evidence, we find the Tribunal's award to Music fairly inexplicable in light of the Tribunal's position, in explaining its non-award to NAB, that radio retransmission by cable (which presumably includes retransmission of radio's music) has virtually no marketable value whatsoever. The mere fact that Music introduced evidence indicating that approximately 70% of the total time of commercial FM radio stations is occupied by music, *see* Tr. 2708–10, JA 146, does not seem to warrant an award given the Tribunal's conclusion, vis-à-vis NAB, that it had been unable to discern *any* marketplace value for all (100%) of distant commercial radio carriage, 47 Fed.Reg. 9,894 (1982). Contrariwise, the Tribunal's award to Music suggests that its non-award to NAB was arbitrary.

On appeal, counsel for the Tribunal suggests that "an award for the *musical content* of radio signals is not inconsistent with the denial of an award for the *format* of a rock-and-roll or country-and-western station." Tribunal Brief at 39 (emphasis added). Whatever the merits of this distinction, it constitutes the sort of post-hoc rationalization on which the defensibility of the Tribunal's distributions cannot depend:

> [A] reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis.

*SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). As we read the Tribunal's Decision, it denied an award to commercial radio broadcasters because it was unable to discern any mar-

ketplace value to distant commercial radio carriage *in toto,* and not because it failed to discern any value to the "formatting" element of a radio signal. Indeed, we are not even certain that the Tribunal would subscribe to its counsel's post-hoc suggestion. The Tribunal expressly concurred in PBS's assessment of the commercial radio evidence, 47 Fed.Reg. 9,894 & n. 494, and PBS gave particular weight to the testimony of Mr. Lee Abrams, a commercial radio analyst, *see* PBS Proposed Findings of Fact at 100, *reprinted in* JA 159–60. Included in Mr. Abrams' testimony, however, was his belief that the "format" element of a radio signal was *more important* than the "music" element:

> Radio stations play records. The same records are available to all radio stations. Why is it, then, that some stations succeed in attracting and appealing to many listeners and others fail? The answer is *formatting.* Formatting is the pre-planning and control of all elements of a radio station's presentation so as to create a consistent and unified sound.

Tr. 2610–11, JA 1358–59 (emphasis added). Moreover, the context of the Tribunal's only specific reference to "format"—in a quotation from Mr. Frank Mankiewicz— does not readily lend itself to a distinction between Music Claimants and commercial broadcasters. Mr. Mankiewicz testified:

> [I]t is difficult to imagine the appeal in community 'A' of an additional top 40 station whose signal is b[r]ought from community 'B'. Since commercial radio stations, with very few exceptions, are using one of five, or, perhaps, at the most, six formats which are present in every commercial market, our feeling is that the appeal of an imported commercial station signal is very limited.

47 Fed.Reg. 9,894 (1982). As we indicated in *NAB v. CRT,* Mr. Mankiewicz's allusion

to "the ubiquity of recorded music" may provide an adequate basis on which to deny an award to commercial radio claimants in general. *See* 675 F.2d at 379–80 (reviewing 1978 Determination in which Tribunal made no award to either the "music" or "format" elements of retransmitted radio signals). But Mr. Mankiewicz's testimony provides a questionable basis on which to foreclose broadcasters from an award because of the ubiquity of their formatting while simultaneously granting an award to the Music Claimants because their ubiquitous music was played 70% of the time. *See also* NPR Intervenor Brief at 9; NAB Reply Brief at 13–14 (indicating that 15% of commercial radio stations, constituting more than four times the number of NPR stations, provide relatively uncommon program formats).

Although it may well be that the Tribunal can adequately explain its different treatment of the Music and commercial broadcasting radio claimants, the inadequate state of its present explanation requires us to set aside its "radio" award to Music and non-award to NAB as arbitrary. Accordingly, we remand these aspects of the Tribunal's Decision to the agency.[*]

CONCLUSION

As we indicated in *NAB v. CRT,* the Tribunal faces a difficult task in conducting the distribution of cable royalties "because of the number of claimants and the inescapably qualitative problem of evaluating their competing claims." 675 F.2d at 385. Our appreciation of the complexities involved in cable royalty distribution has not diminished; indeed, the Tribunal's task may become even more difficult as claimants attempt to interpret the nuances of the Tribunal's past decisions and to improve accordingly the sophistication of their evidentiary presentations. Although, *in many* respects, we find challenges to the Tribu-

---

[*] In its intervenor's brief, the Canadian Broadcasting Corporation (CBC) also challenges the Tribunal's Decision; in particular, CBC objects to what it perceives to be a non-award for CBC FM "public" radio. Although CBC's claim is not properly before us in a petition for review, we note that CBC's objections appear mis-

placed—the Tribunal's 0.75% Phase II award for Canadian broadcasting was meant to exclude only commercial, but not CBC FM, radio. *See* Tribunal Brief at 41 ("The Tribunal did not make separate awards for television and radio. The Tribunal did not treat CBC FM radio as a commercial operation....").

nal's 1979 Decision to reflect little more than the boundless litigiousness of disappointed claimants, the increasing complexity of the Tribunal's allocations only underscores, in other respects, the need for improved clarity in the Tribunal's decisionmaking. As this court has stated before:

> We wish to emphasize ... that precisely because of the technical and discretionary nature of the Tribunal's work, we must especially insist that it weigh all the relevant considerations and that it set out its conclusions in a form that permits us to determine whether it has exercised its responsibilities lawfully. Courts may not make the judgments entrusted to politically-accountable institutions. They can and must, however, ensure that those judgments provide a basis for popular review by requiring that the choices they reflect are informed by the views of all interested parties and are fully disclosed.

*National Cable Television Association v. Copyright Royalty Tribunal,* 689 F.2d 1077, 1091 (D.C.Cir.1982) (Bazelon, J.).

We do not mean to charge the Tribunal with needless formalism: given its burden of simulating the subtleties of the cable marketplace within a one-year decisionmaking period, the Tribunal need not lace its distribution determinations with unnecessary rhetoric. But Congress *has* directed the Tribunal to state in detail the criteria, factual findings, and "specific reasons for its determinations." 17 U.S.C. § 803(b) (Supp. V 1981). The Tribunal may not abdicate this responsibility. Nor may it attempt to distinguish apparently inconsistent awards with simple, undifferentiated allusions to a 10,000-page record. As the Tribunal continues to accumulate experience with royalty fee distributions, we continue to hope that the clarity of its decisionmaking will improve.

For the reasons discussed above, the Tribunal's 1979 Decision is remanded for the reconsideration described in Parts III B and III D of this opinion and is, in all other respects, affirmed.

*So ordered.*